559 A.2d 904

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Roland William STEELE, Appellant.**

Supreme Court of Pennsylvania.

Argued March 6, 1989.

Decided June 5, 1989.

John P. Liekar, Sr., Office of Public Defender and Paul A. Tershel, Washington, for appellant.

John C. Pettit, Dist. Atty. and William A. Johnson, Asst. Dist. Atty., Washington, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

McDERMOTT, Justice.

The appellant was tried by a jury and found guilty of three counts of murder in the first degree,[1] two counts of robbery[2] and two counts of theft by unlawful taking.[3]

1. 18 Pa.C.S., §§ 2501; 2502(a).
2. 18 Pa.C.S., § 3701.
3. 18 Pa.C.S., § 3921.

After further deliberations that same jury rendered three separate verdicts of death for the three first degree murder convictions.[4] Post trial motions were denied and the judgement of sentence was entered on March 25, 1988. Two consecutive sentences of ten to twenty years were imposed on the robbery convictions. The theft convictions were merged with the robbery convictions. Appellant directly appealed the judgement of sentence.[5]

On June 23, 1985, the appellant was arrested in connection with the deaths and robberies of Lucille Horner, age 88, Minnie Warrick, age 86 and Sarah Kuntz, age 85. The bodies of the victims were found on the morning of June 22, 1985, in a secluded, wooded area, off a dirt road in Cecil Township, Washington County, Pennsylvania. The police investigation that followed led the police to the appellant who was arrested on June 23, 1985, in McKees Rocks, Pennsylvania. The appellant raises several claims of trial error. Before addressing these claims, we must first determine whether the evidence presented was sufficient to sustain his convictions.[6]

When a criminal agency intrudes upon the common place, the ordinary way of things, it explodes them into shards and splinters and they and people are changed forever. The shards and splinters, however, can often be collected to show what was and who did what. Such evidence is circumstantial and can be collected, to prove beyond a reasonable

---

**4.** 42 Pa.S.C., § 9771.

**5.** See 42 Pa.C.S., §§ 722(4); 9711(h)(1). Pa.R.A.P. 702(b).

**6.** It is the practice of this court in cases in which the the death penalty has been imposed to review the sufficiency of the evidence supporting the conviction. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26–27, n. 3, 454 A.2d 937, 942, n. 3 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt. *Commonwealth v. Syre,* 507 Pa. 299, 489 A.2d 1340 (1985).

doubt, who did what to whom. Here to recount the evidence is to draw that picture.

The record reveals that on Saturday, June 22, 1985, at approximately 6:15, a.m., Cedra McDavis, discovered the body of Lucille Horner and called the police. When they arrived, Trooper William Cunningham of the Pennsylvania State Police, discovered the bodies of Minnie Warrick and Sarah Kuntz under a near-by pile of discarded tires. Subsequently a Doctor Earnest L. Abernathy, the Chief Deputy Coroner of Washington County, performed the autopsies at 1:30, p.m., Saturday, June 22, 1985. He placed the times of death around 20 hours prior to the autopsies, with a four to five hour, plus or minus margin of error.

Police had learned through friends and family members of the victims, that all three had attended a charitable luncheon together at the Club Internationale in the Millcraft Shopping Center the day before on Friday, June 21, 1985. The luncheon began around 1:00, p.m.. It was also learned that they had driven to this function in Mrs. Horner's car.[7] At trial three witnesses testified that they had seen the appellant on Friday, June 21, 1985, between the times of 11:30, a.m., and 2:25, p.m., in the City of Washington.[8] Subsequently three different witnesses testified that they had seen the appellant with the victims in, or near, the Millcraft Shopping Center.

The first of these witnesses, Mrs. Mildred Stitler, testified that she lived in the Bassettown Manor Apartments, located next to the Millcraft Shopping Center, and that from her apartment windows she had an unobstructed view of the shopping center's parking lot. She testified that on that Friday, from her apartment window, she had seen a bald

7. Police then upon failing to find Mrs. Horner's car at the shopping center entered a description of the vehicle in the National Crime Information Center. It was subsequently located in Pittsburgh, Pennsylvania, and taken to the state police barracks in Washington, Pennsylvania.

8. Each of the three witnesses identified the appellant at trial. In addition, two testified as to the appellant's dress that day. One stated that he was wearing a grey three piece suit and the other stated he was wearing a dark business suit with no necktie.

headed colored man, who she identified as the appellant, wandering through the parking lot. She testified that she saw him go up to the "lady that had the car" and point to the tire of the car, apparently trying to show her that something was wrong with it. She testified that the lady then got out of the car and eventually got into the passenger-seat and that the appellant then got into the driver-side. She further testified that she then saw the appellant and this lady, pick up two other ladies who apparently were waiting for the car. The second witness, Kimberly Oyler, testified that she was in the Millcraft Shopping Center's parking lot on Friday, June 21, 1985 [9] and that she had seen the appellant holding the car door open to Mrs. Horner's Dodge Dart, for Mrs. Kuntz, who was getting into the backdoor, on the passenger-side of the car.[10] In addition she stated that the appellant was wearing a dark colored suit without a necktie. The third witness, Harry Crothers, testified that at approximately 2:30 that day, a vehicle coming from the Millcraft Shopping Center entered the roadway in front of his vehicle on Franklin Street in Washington. He testified that his friend's mother-in-law, Mrs. Horner, was in the passenger seat of the vehicle, that two ladies were in the back seat and that a bald headed man whom he identified as the appellant, was driving the vehicle.

Next a Joseph Klements testified that on Friday, June 21, 1985, at approximately 3:00 or 3:30, the appellant drove into his service station, alone. He testified that the appellant was driving a cream colored, 1974, four door Dodge or Plymouth, which was in remarkable condition. At the trial he identified the car that the appellant was driving that day, as Mrs. Horner's car. This identification was from a photo-

---

**9.** She testified that she was at the shopping center for a 2:30, p.m., doctors appointment. N.T., vol. 1, p. 258.

**10.** She had testified that she first identified the appellant from his picture in the local newspaper subsequent to arrest. N.T., vol. 1, p. 265. However she also testified that at the time she saw the appellant, she was standing approximately 10 to 12 feet away from him and that their eyes met. N.T., vol. 1, p. 262, 267.

graph of the vehicle.[11]   He also testified that on Saturday, the 22nd of June of 1985, he went to the Washington State Police barracks and identified the appellant from a photo lineup.[12]   He also stated that the appellant had been wearing a three piece suit.

Joseph Klements testified that the appellant was at his station for approximately five to seven minutes and that when he left he was travelling toward Hendersonville but then passed the station going towards Cannonsburg, on Cecil–Henderson Road, approximately five minutes later. He further stated that the appellant returned in Mrs. Horner's car at approximately 4:15 that same day and that he coasted down the hill from the Cannonsburg direction and then into the service station.   He explained that when the appellant returned, the car was stalled and was then started by his son, Victor.

Victor Klements, Joseph Klements' son, testified[13] that he had a conversation with the appellant when he first came into the service station's store to buy two cans of soda.   He stated that the appellant told him he grew up in the area and that the appellant had asked him about people from the area.   In addition he testified that he saw the appellant give an eleven year old boy, Willie Scafranski, a gold chain. This chain was subsequently introduced into evidence and was identified as belonging to the victim, Mrs. Minnie Warrick.[14]   He also testified that the appellant had returned

11.   This photograph was introduced as Commonwealth's exhibit number 12.

12.   This photo lineup was introduced as Commonwealth's exhibit number 15.

13.   He also testified that he went to the Washington State Police barracks and identified the appellant from a photo lineup on Saturday, the 22nd of June, 1985, and further that the appellant was driving Mrs. Horner's car.

14.   Trooper James Patt, of the Pennsylvania State Police identified the gold chain as the one he received from Willie Scafranski, at his residence on June 24, 1985.   Willie Scafranski had identified the appellant as the person who had given him the gold chain.   He testified that he had turned it over to the police.   Also testifying was Mark Hall, a friend of Willie Scafranski, who identified the appellant as the person at the store.   Mark Hall stated that while he did not

to the store at approximately 4:15. He then stated that the appellant had coasted his car down the hill on the road coming from Cannonsburg, that the car was flooded and that he helped him start the car. After which the appellant then departed. Janice Klements, the wife of Joseph Klements, testified that she had brought her husband his dinner that day and that she saw the defendant coast down the hill coming from the Cannonsburg direction into the station around 4:15. Further that it was a four-door, cream colored automobile.[15]

Also testifying at trial, was Delha Woznicak. She testified that her home, up the hill from Klements Service Station, was broken into on Friday, June 21, 1985, sometime between 3:25 and 4:50 p.m..[16] She identified evidence introduced at trial as items stolen from her home on day in question. These items included a Hitachi television, the scales of justice, red lamps with striped shades, and pole lamp. Mrs. Woznicak also identified the bottom portion of a dress that she had found in her home while cleaning up after the burglary. This piece of clothing was the skirt to the dress worn by Mrs. Minnie Warrick on the day she was murdered.[17]

actually see the appellant give the chain to Willie, Willie showed it to him immediately after the appellant left.

Joan Lutz, the daughter of Minnie Warrick, identified the necklace as the one she had given her mother for a present in 1984. Gaye Warrick, a niece of Minnie Warrick by marriage, identified the necklace and testified that she had seen the victim on a weekly basis prior to her death and that every time she had seen victim, she wore the chain.

15. Janice Klements also testified that she identified the appellant from the photo lineup that Saturday.

16. Specifically she stated that she and her husband had left their home around 3:25 that day and that when she returned around ten minutes to five, the police were there.

17. Gaye Warrick had earlier testified that this part of a dress, the skirt, was part of a one piece dress owned and worn by Minnie Warrick, to the luncheon, the day of her death. A friend of the decedent, also identified the skirt as part of a dress the decedent had purchased on the Saturday before Easter of 1985.

It was also identified by Trooper John Luppino. He testified that the top portion was still on Ms. Warrick's body when he arrived at the murder scene.

Testimony at trial established that the appellant was in possession of the items stolen from the Woznicak home. This testimony was provided by Trooper Benard Stanek, of the Pennsylvania State Police, who testified that he participated in the search of the home of the appellant's girlfriend, Joan Whitlock, with whom the appellant was then living. In the search, items removed from the Woznicak home were recovered.[18] In addition Trooper Stanek testified that he measured the distance from Klements Service Station to were the victims bodies were found and that the distance was approximately 1.5 miles and was travelled by him in approximately 4 minutes by vehicle. In addition he testified that he measured the distance between Klements Service Station and the Woznicak residence and that the distance was approximately three tenths of a mile and that he travelled this route by vehicle in thirty seconds.

Trooper John Luppino, of the Pennsylvania State Police, testified to the respective distances between the various relevant locations. He testified that he travelled two different routes from Klements' Service Station to the Whitlock home. The first route was approximately 25.8 miles and required 35 minutes and 42 seconds by automobile and the second route was approximately 18.9 miles and required 29 minutes and 30 seconds by automobile. This was significant because the Commonwealth established through three witnesses, that at approximately 5:30 on Friday, June 21, 1985, the appellant was at the Whitlock home unloading the stolen items from the trunk of Mrs. Horner's car. He was observed taking these items into the Whitlock home. Notably one of these witnesses, a Cathryn Slusser, testified that she had seen the appellant parking the car and that while there was plenty of room to park, he backed up extremely close to the car behind him, like he was trying to hide the licence plate from view.

Duane Jordan, the brother of Joan Whitlock, testified that he had known the appellant for about a year and that

18. Trooper Stanek also stated that during the search, Mrs. Whitlock had told him that these items were brought there by the appellant.

the appellant came to his mother's home, in Broadhead Manor at 3765 Old Orchard Circle, on the night of Friday, June 21, 1985. This too was significant because Raymond Simms Ray, an employee of the Pittsburgh Housing Authority, testified that while he was assigned to the cleanup detail at Broadhead Manor he found a white clutch purse containing credit cards, between buildings 23 and 24 on Old Orchard Circle. Trooper Stanek, testified that on June 25, 1985 he went to Broadhead Manor, met with Mr. Ray and received a white vinyl bag that resembled a purse, which contained among other things, credit cards issued to Lucille Horner and Sarah Kuntz.

In addition to the above testimony which established the appellant's movements on the day in question, his presence with the victims and his possession of the stolen car and other stolen items of personalty, the Commonwealth presented the testimony of Alfred Adams. Mr. Adams stated that he and the appellant were childhood friends and that both grew up in an area known as National Two, approximately 1 mile from Hendersonville. He stated that the appellant previously lived 600–800 yards from the location where the bodies were found. An Andrew Podolak, a special agent of the Federal Bureau of Investigation, was also called to testify. He had performed an examination on hair fibers found on the appellant's clothing which were removed during the search of the home of appellant's girlfriend. He testified that in his expert opinion, based upon his comparison of those hair fibers found with head hair samples taken from the victim, Minnie Warrick, the hair fibers found on the appellant's clothing were from the head of Minnie Warrick.

Moreover the Commonwealth established that the appellant had been an instructor in the martial arts and that he held a black belt in karate.[19] This information was of consequence in light of Doctor Abernathy's testimony re-

19. The Commonwealth had presented the testimony of two witnesses to establish the above and in order to preclude further testimony on the subject, the defense stipulated to the appellant's expertise in martial arts.

garding the causes of death of the victims. He testified that the injuries suffered by each of the victims, between the upper abdomen and the chin, were very similar. He also testified that the trauma received by the victims in the chin, neck and upper chest portions of the of their bodies in particular, were sustained at approximately the same time, all developing the same degree of discoloration. It was his opinion that due to the similarities in injuries in this area, including the lack of foreign particles in the areas of the bruises, the lack of skin lacerations and the pattern lengths, that each of the injuries was caused by blows delivered by a hand. N.T., vol. 1, p. 194-96.

The Commonwealth's final witness was Sarah Hair. Ms. Hair testified that on the 18th of June, 1985, at approximately 6:15, p.m., she was at the Charter Valley Mall, in Bridgeville, Pennsylvania, (located approximately six miles from Hendersonville) and was approached by the appellant while entering her car. She stated that the appellant told her that he had seen somebody messing around with her car and that there was a nail in her tire. Further that the appellant was persistent about going with her in her car to have the tire looked at. She then testified that when she first looked at the tire she found nothing wrong with it but that after she had gotten back into her car, the appellant bent down, near the tire, called her back out of the car and pulled a pair of scissors from under the wheel. She then testified that she took them and told him she would take them to the police and that the appellant then asked for them back stating he would take them to the police. After she again stated she would, he again offered to go with her, which offer she refused. She then testified that she reported this incident to police that night.[20]

**20.** This testimony was corroborated by a Ms. Rosalyn Fields, one of the Commonwealth's rebuttal witnesses. The appellant denied having been in the Bridgeville area. Ms. Hair testified that she had an encounter with the appellant on the 18th, at the Great Southern Shopping Center located next to the Charter Valley Mall on the Washington Pike, in Bridgeville, Pennsylvania. She testified that the appellant approached her in the parking lot when she was getting out of her car. Further that she called the police to report the incident.

█ We believe the evidence presented by the Commonwealth was sufficient to establish that the appellant robbed Lucille Horner and Minnie Warrick and that he murdered all three.[21] The fact that all of the evidence presented was circumstantial is of no monument, because circumstantial evidence is sufficient to sustain a conviction "so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt". *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988) (citations omitted). With the above in mind, we address the appellant's specific allegation of trial error, seriatim.

█ The appellant first alleges that the trial court violated his right to due process by allowing the identification testimony of Willie Scafranski, Mark Hall, Joseph Klements, Victor Klements, Janice Klements, Mrs. Stitler and Mrs. Oyler. He asserts that their identification of him was allegedly tainted by newspaper photographs depicting him in shackles while under arrest. He cites *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), for the proposition that this identification testimony was subject to suppression. Further he claims that the testimony of these witness was the only evidence linking him to the crimes.

Appellant's claim is without merit. He errs in asserting that the testimony was even subject to suppression under *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), since the identification testimony was not the result of improper behavior ascribable to law enforcement officials.[22] Furthermore, every aspect of each witness' pretrial

21. We note that the appellant took the stand in his defense and gave uncorroborated testimony denying the charges. He testified that he left Cannonsburg for Pittsburgh at approximately 1:00, p.m., on the day of the murders, with a person he knew only as P.C.. P.C. never testified nor was his identity ever established. Further the appellant explained that he purchased the items from the Woznicak home from an unknown person, out of the back of a blue van, on a street in the Hill District of Pittsburgh. The jury was free to believe or disbelieve his testimony. The weight the jury attached to the appellant's uncorroborated testimony is non-appealable. *Commonwealth v. Nelson*, 514 Pa. 262, 271, n. 3, 523 A.2d 728, 733, n. 3 (1987).

22. This is simply not a situation involving impermissibly suggestive police identification procedures. Willie Scafranski, Mark Hall, Jo-

identification, including the fact that some of the witnesses had only gone to the police after hearing of the murders or seeing appellant in the news media, was presented to the jury. In addition, these witnesses were subject to a full cross-examination. The appellant's challenge goes to the weight of the evidence, not its admissibility, and the jury was free to believe or disbelieve the witnesses testimony. *Commonwealth v. Clark*, 454 Pa. 329, 311 A.2d 910 (1973). Further this court does not entertain challenges to the weight given to evidence by a jury. *See Commonwealth v. Nelson*, 514 Pa. 262, 271, n. 3, 523 A.2d 728, 733, n. 3 (1987). We do not believe that the trial court abused its discretion in allowing the identification testimony since the testimony was relevant and the witnesses were competent to testify.[23]

seph Klements, Victor Klements and Janice Klements, testified that they had identified the appellant from a photographic array and their testimony indicates, prior to the appellant's arrest and thus prior, to any suggestive news media coverage or pre-trial proceedings. This photographic array was introduced at trial as Commonwealth's exhibit, number 15, contained eight photos and the appellant does not claim that it was impermissibly suggestive.

The only other challenged witnesses were Mrs. Stitler and Mrs. Oyler. Mrs. Oyler testified that she saw the appellant's photo in the local newspaper and then called the police to report that she saw the appellant at the Millcraft Shopping Center with the victims. On cross-examination she admitted that when the police came to her home they showed her a single photograph of the appellant but at that time, she already knew the person she saw in the parking lot was the appellant from the newspaper. She testified that in the parking lot, the appellant was only ten to twelve feet away from her, that she clearly saw his face and that at one point, they had eye contact. Thus there was sufficient independent basis to allow her testimony. See, *Biggers*, 409 U.S. at 199, 93 S.Ct. at 382.

Mrs. Stitler's testimony is ambiguous in regard to when she first determined that it was the appellant who she saw the day of the murders, but she admitted that she had seen news media photos of the defendant. However the record does not support any assertion nor does the appellant claim, that law enforcement officials did anything to suggest to her, that it was the appellant whom she saw.

**23.** This claim and the appellant's second, third, fourth, fifth and seventh claims of trial error, relate to the admissibility of evidence. In reviewing these claims we are guided by the rule of law that the admissibility of evidence is a matter addressed to the sound discretion of the trial court, and that an appellate court may reverse only upon a showing that the trial court abused its discretion. *Commonwealth v. Claypool*, 508 Pa. 198, 204, 495 A.2d 176, 178 (1985); *Commonwealth v. Bartlett*, 446 Pa. 392, 400, 288 A.2d 796, 799–800 (1972).

■ He next alleges that the trial court erred in refusing his request to introduce the testimony of two police officers who each misidentified the appellant on separate occasions. The appellant asserts that their testimony was relevant to show that the Commonwealth's witnesses had allegedly erred in their identification of the appellant. The trial court held that the testimony was irrelevant. The record indicates that the prior identifications were made in matters unrelated to the appellant's convictions. We find no abuse of discretion in the trial court's ruling.

■ The appellant next alleges that the trial court erred in not granting him a continuance to secure a witness. The appellant had subpoenaed Cedra McDavis to testify but she failed to appear.[24] He had sought to introduce Ms. McDavis' testimony to establish that another black male was allegedly committing unlawful acts of violence in the immediate vicinity of where the victims bodies were found. This individual was allegedly arrested and charged with sexually abusing Ms. McDavis' child the day the victim's bodies were found. The trial court found that testimony was irrelevant and thus denied the continuance. We find no abuse of discretion in this ruling.

Appellant next alleges that the trial court erred in excluding expert testimony which he alleges would have established that the murders were committed by a psychotic, that the he was not a psychotic and thus, that he did not commit the murders. The trial court found the offered testimony highly speculative and lacking in probative value and thus excluded it as irrelevant. We detect no abuse of discretion here either.

■ The appellant next alleges that the trial court erred in refusing his request, at trial, to compare a negroid hair fiber, found in Mrs. Horner's car, to that of Joan Whitlock and her son, Sean Whitlock. The record reflects that on the fifth day of trial, appellant made a request to have the comparisons made however the record does not disclose

24. The appellant was granted an over night recess to locate her but he could not.

when, if ever, the trial court denied the appellant's request. See N.T., vol. 1, p. 600–603. Accepting this assertion as true, we still find that it does not constitute reversible error. The appellant was aware of the existence of the hair fiber prior to trial, but failed make any pretrial request for a comparison. Further the trial court made every effort to accommodate the appellant in his pre-trial requests for assistance in preparation of his defense. It was incumbent upon him to initiate the testing prior to trial under these circumstances and thus we find that if the trial court did in fact deny the appellant's request, it was proper. Furthermore we do not believe that trial counsel's failure to make a pretrial request for a comparison amounts to ineffective assistance.[25]

Appellant next attacks the sufficiency of the evidence. He asserts that there was no evidence establishing his presence with the victims at the time they were murdered nor at the site where their bodies were found. He further alleges that there was no physical evidence presented establishing that he was ever in the victims car. We previously addressed the sufficiency of the evidence and found the appellant challenge to be meritless.

Circumstantial evidence is sufficient to sustain a conviction "so long as the combination of evidence links the

25. While the rules of waiver are somewhat relaxed in capital punishment cases, we still apply an ineffective assistance analysis to a situation such as this. See *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982); *Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531 (1988).

Appellant's trial counsel had a reasonable basis for not requesting the pre-trial test. If the tests resulted in a positive match, with either Joan or Sean Whitlock, then the tests would have directly inculpated the appellant and the Commonwealth could have made use of the results. However if the tests had proven negative, their evidentiary value would have been minimal since it would not have exculpated the appellant because it would not have directly refuted any of the Commonwealth's case. Thus trial counsel had a reasonable basis for not to making the request and therefore cannot be deemed ineffective. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987); *Commonwealth v. Clemmons*, 505 Pa. 356, 479 A.2d 955 (1984); *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967).

accused to the crime beyond a reasonable doubt". *Commonwealth v. Hardcastle,* 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988) (Citations Omitted); *Commonwealth v. Holcomb,* 508 Pa. 425, 447, 498 A.2d 833, 844 (1985) ( ... the cumulative effect of all the circumstantial evidence together with the reasonable inferences and conclusions logically flowing from that evidence is enough to support the guilty verdict.) A death sentence can be imposed in cases where a conviction for murder of the first degree rests upon circumstantial evidence. See *Commonwealth v. Yarris,* 519 Pa. 571, 602–03, 549 A.2d 513, 529 (1988); 42 Pa.C.S., § 9711(e).

Here the evidence, while circumstantial, placed the appellant with the victims prior to their deaths. It established his possession of the victims' car and gold chain, and his familiarity with the area in which the victims' bodies were found. It further demonstrated his expertise in the martial arts and indicated that just three days before, he had attempted to trick another women into letting him into her car. We conclude that there was sufficient evidence from which the jury could conclude that the appellant had robbed Lucille Horner, Minnie Warrick, and murdered all three victims.[26]

■ He next alleges that the trial court erred in permitting evidence of the burglary of the Woznicak home, the appellant's possession of the stolen items and the testimony relating to the finding of Mrs. Warrick's skirt in the Woznicak home. As a general rule, evidence of a separate crime is inadmissible however where the evidence is relevant, the mere fact that testimony of another crime may be preju-

---

**26.** The appellant asserts in his brief to this court that the evidence was insufficient to sustain his conviction of the (3) counts of robbery, in addition to the (3) counts of murder. However the record reflects that the the appellant was convicted of (2) counts robbery and (2) counts of theft and that the trial court, had sustained the demurrer of appellant with regards to the robbery and theft charges relating to the victim Sarah Kuntz and dismissed those charges. Notably the evidence placed the appellant in the vicinity of where Sarah Kuntz's stolen credit card was found. We believe that the jury could have reasonably found that the appellant had stolen it and left it where it was found. However the court limited the evidence to information charged in the indictments. N.T., vol. 1, p. 734.

dicial will not prevent its introduction into evidence. See *Commonwealth v. Lasch*, 464 Pa. 573, 347 A.2d 690 (1975). This Court has stated that evidence of this nature is admissible when "there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other." *Commonwealth v. Wable*, 382 Pa. 80, 82, 114 A.2d 334, 336–37 (1955). It would be hard to imagine clearer connection than that presented in this case. We find that the trial court did not abuse its discretion by admitting this evidence.

■ Appellant's final allegation of error is that the trial court erred in submitting the question of torture to the jury since there was insufficient evidence from which to establish that he intended to torture the victims. Furthermore he asserts that the juries finding of torture is not supported by the evidence since there was no evidence that the victims suffered considerable pain or that he intended to torture them. We disagree.

A jury may determine from the manner of death that other reasons than overcoming resistence or silencing a victim were at play in the killing. To take three elderly defenseless ladies to a remote spot to kill them as one pleases may be read by a jury to be more than killing to effect a robbery. They may believe that the known infliction of aimed organ smashing blows was deliberate practice in the art of killing, observing with satisfaction both the pain and disability inflicted. Under such circumstances they could well believe and find that the victims were tortured by a deliberate, selected ingredient added to a felonious killing.

The evidence established that the victims were mercilessly beaten to death in the presence of each other. Doctor Abernathy testified that he performed the first autopsy on the body of Lucille Horner. He stated that the left lobe of her thyroidal gland was almost torn away from the windpipe and that the voice box, larynx, and the vocal cord were torn away. He stated the liver was almost completely shattered and that there was hemorrhaging in the kidneys

and the pelvis area of the kidneys. Further that seven (7) ribs on the right side of the rib cage and 8 on the left, had been broken and vertebra to the back bone, had been broken. He testified that the right side of the heart had been almost shattered by a very hard blow. Doctor Abernathy described the conditions of the other bodies as well. He testified that the pattern of injury he found with the autopsy of Mrs. Horner was quite similar to that which he found in subsequent autopsies. He described the injuries in detail to the jury. Notably he testified that Mrs. Kuntz was probably dead or was dying from asphyxia, due to the blow to her throat, before her liver was shattered and her heart was severed. It is reasonable to assume from the nature and extent of the beatings, that the victims suffered considerably.[27] A reasonable inference can be drawn from the method used to kill his victims, that the defendant did in fact intend to inflict great pain before he actually did kill. Furthermore Doctor Abernathy described the victims as very old and quite fragile, and the evidence established and the defense stipulated that, the appellant was a martial arts expert and thus the jury could have properly inferred that the appellant's beating of each victim was unnecessary painfull and was done merely to torture them before striking the final death blow.

Thus we do not believe that the trial court abused its discretion in submitting the question of torture to the jury. Moreover the record reflects that the trial court properly charged the jury, by defining torture as the infliction of a considerable amount of pain and by stating that it must be shown beyond a reasonable doubt that the defendant intended to torture his victims to death. There is a presumption in the law that the jury followed the instructions given by the trial judge and thus, properly found that the appellant did intend to torture the victims. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 55, 337 A.2d 873, 879 (1975) (We will not presume that the jurors disregarded their duty and the

27. In addition, Dr. Abernathy had testified that the victims were in a standing position when the blows were delivered. N.T., vol. 1, p. 201. His testimony supports this conclusion.

instructions of the Court); *Dauphin v. Standard Oil Company*, 312 Pa. 229, 232, 167 A. 287, 288 (1933) (The presumption is that the jury complied with the court's instructions).

■ Finally, in all cases in which the death penalty has been imposed, we are obligated by statute to review the record and to assure that the death sentence: is not the product of passion, prejudice or any other arbitrary factor;[28] is supported by a finding of aggravating circumstances specified in subsection (d);[29] and is not excessive or disproportionate to the penalty imposed in similar cases....[30] Further pursuant to *Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we are obligated to review data and information pertaining to similar cases, compiled by the Administrative Office of the Pennsylvania Courts (AOPC).

The jury had found that the aggravating circumstances outweighed any mitigating circumstances in the three murders. Specifically the jury found that the appellant murdered Ms. Horner by means of torture, while committing a felony and while committing other capital offenses.[31] This is supported by the record and is within the statute. 42 Pa.C.S., § 9711(d)(6), (8), and (10). The jury found that the appellant murdered Ms. Warrick by means of torture, while committing a felony and while committing other capital offenses. This is supported by the record and is within the statute. 42 Pa.C.S., § 9711(d)(6), (8), and (10). The jury found that the appellant murdered Ms. Kuntz by means of torture and while committing other capital offenses. This is supported by the record and is within the statute. 42 Pa.C.S., § 9711(d)(8) and (10). Furthermore we find the punishment appropriate and not the product of passion, prejudice or any arbitrary factor. We also have reviewed

28. 42 Pa.C.S.A., § 9711(h)(3)(i).

29. 42 Pa.C.S.A., § 9711(h)(3)(ii).

30. 42 Pa.C.S.A., § 9711(h)(3)(iii).

31. An offense for which a sentence of life imprisonment or death is imposable.

80

an AOPC study and the appellant's sentence is not disproportionate to the sentence imposed to others similarly situated.

Based upon the forgoing reasons, we sustain the convictions and affirm the sentences.

STOUT, Former J., did not participate in the decision of this case.