687 A.2d 1102

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jose Antonio MARRERO, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 20, 1995.

Decided Dec. 26, 1996.

Reargument Denied Feb. 21, 1997.

598

---

Joseph P. Burt, Ines M. Massella, Timothy Lucus, Erie, for J. Marrerro.

William R. Cunningham, Erie, Robert A. Graci, Attorney General, Jerome T. Foerster, Harrisburg, for Commonwealth.

Before NIX, Former C.J., and FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

*OPINION ANNOUNCING THE JUDGMENT*
*OF THE COURT*

CASTILLE, Justice.

Following a six (6) day jury trial, appellant was convicted of first degree murder,[1] burglary,[2] theft by unlawful taking or disposition,[3] and possession of an instrument of crime[4] in connection with the death of sixty-eight year old Elizabeth Smith.[5] Following a penalty hearing, the jury sentenced appellant to death, finding that the aggravating circumstance it found[6] outweighed the mitigating circumstance it found.[7] On October 25, 1994, the trial court imposed the jury's sentence of death for the first degree murder conviction and additionally sentenced appellant to serve an aggregate term of 6 to 12 years imprisonment on the remaining convictions. This direct appeal followed. For the reasons below, we affirm the conviction and judgment of sentence.

## I. Sufficiency of the Evidence

As is required in all cases where the death penalty has been imposed, this Court must conduct a review of the evidence to determine whether it supports the first degree murder conviction. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26, 454 A.2d 937, 942 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). When reviewing a sufficiency of the evidence claim, an appellate court, viewing all the evidence and reasonable inferences therefrom in the

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 3502(a).

3. 18 Pa.C.S. § 3921(a).

4. 18 Pa.C.S. § 907.

5. The jury entered a verdict of not guilty on the rape charge, and the trial court entered judgments of acquittal on charges of receiving stolen property and abuse of a corpse.

6. 42 Pa.C.S. § 9711(d)(6) (the defendant committed a killing while in the perpetration of a felony—burglary).

7. 42 Pa.C.S. § 9711(e)(8) (any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense—that his personality changes when using alcohol).

light most favorable to the Commonwealth as the verdict winner, must determine whether the evidence was sufficient to enable the fact finder to find all of the elements of the offenses beyond a reasonable doubt. *Commonwealth v. Burgos,* 530 Pa. 473, 476, 610 A.2d 11, 13 (1992). Viewing the evidence in its proper light, we find that the evidence amply supports the conviction of first degree murder.

The evidence at trial was that on January 16, 1994, sixty-eight year old Elizabeth Smith was found murdered in her ransacked apartment in Erie, Pennsylvania by her son and landlord. Erie police officers, who responded to the scene of the crime, testified that they found the victim, who was dependent on an oxygen tank due to emphysema, lying on her back, stripped from the waist down with her legs spread apart. A Nintendo game set and a diamond ring were missing from her residence.

Ten days later, on January 26, 1994, the Cleveland, Ohio Police Department was contacted by a source who suspected that appellant had killed someone. The source based that suspicion on the fact that appellant, whom the source knew did not own an automobile, was driving a car, that there were blood stains on his clothing and hands and that appellant had scratch marks on various parts of his body.[8] While investigating that report, the Cleveland police were informed by appellant's girlfriend's children that appellant had returned to Cleveland from a trip to Erie and had given a diamond ring to their mother (his girlfriend) and a bloodied Nintendo set to them. Both the ring and the Nintendo set were identified at trial as belonging to the victim.[9]

---

8. The automobile was later determined to belong to the victim.

9. The victim's son identified the ring at trial as one which his mother had worn every day for as long as he could remember. Police identified the Nintendo set based on the coaxial cable which connects the Nintendo set to the television set. The cable had been severed when the Nintendo set was ripped out of the victim's television and a portion of the cable was left behind at the crime scene. According to the children, appellant had spliced the broken cable upon returning to Cleveland to make it work with their equipment. A forensic scientist testified at trial that the cable attached to the Nintendo game set and the portion of cable found at the crime scene matched.

Appellant's girlfriend's brother, who lived in Erie across the street from the victim, also contacted the Erie police on January 26, 1994, and informed them that appellant had shown up unexpectedly at his apartment in Erie on the night of January 12, 1994. Appellant stated upon leaving the brother's apartment that evening that he was going to get some money. He did not return to the brother's apartment until early the next morning before returning to Cleveland. An acquaintance of appellant's also testified that he had been with appellant in Erie on January 12, 1994, in the vicinity of the victim's house, and that when he and appellant parted company that evening, appellant had said to him that he was going to the "old lady's" house. Testimony at trial established that the victim had died the next day, January 13, 1994, during the early morning hours.[10]

Appellant was arrested by the Cleveland police at 9:20 p.m. on January 26, 1994, on charges of receiving stolen property relating to his possession of the victim's automobile. Although the Cleveland police twice advised appellant of his *Miranda* rights,[11] they did not interrogate appellant after arresting him. Instead, aware of the pending murder investigation in Pennsylvania, they notified detectives in Erie of appellant's arrest. Erie detectives then travelled to Cleveland, arriving at approximately 3:00 a.m., at which time they again advised appellant of his *Miranda* rights. Appellant indicated he understood his rights and signed a waiver at 3:20 a.m. Thereafter, appellant spoke to the Erie detectives about the murder for approximately 45 minutes. After speaking with the detectives, appellant agreed to have his statements videotaped.

**10.** This determination was based on (1) the fact that there had been no incoming or outgoing phone calls between 1:20 a.m. on January 13, 1994 and 4:00 p.m. on January 16, 1994, when the victim's landlord called 911; (2) the fact that the gas usage at the house spiked on January 13, 1994, apparently as a result of the kitchen door being left open; and (3) the fact that the victim's next-door neighbor noticed that the victim's bedroom lights had been on since January 12, 1994.

**11.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At 4:30 a.m. the Erie detectives, prior to the taping, again gave appellant his *Miranda* rights, which appellant again waived. His videotaped statement was completed at approximately 5:30 a.m. Appellant admitted in each statement that he broke into the victim's home and attempted to strangle her to death. He further admitted that he ultimately stabbed the victim in the neck to ensure that she was dead.

At trial, the forensic pathologist testified that the victim died as a result of manual strangulation.[12] The pathologist and a DNA expert further testified that the traces of blood and semen found at the victim's house matched appellant's blood and DNA profile. Photographs taken at the scene of the crime were also admitted to show that appellant had broken into the victim's home and dragged the victim from the living room to a hallway off the dining room where she ultimately died.

■ In first degree murder cases, the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing and that the killing was done with deliberation. *Commonwealth v. Mitchell*, 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). Here, appellant confessed that after he strangled the victim and realized she was still breathing, he went into the kitchen, got a knife and stabbed the elderly victim in the neck to make sure she was dead. Appellant's confession coupled with the circumstantial evidence surrounding the victim's death clearly established that appellant killed the victim with malice aforethought. *See, Commonwealth v. Lee*, 541 Pa. 260, 662 A.2d 645 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1831, 134 L.Ed.2d 935 (1996) (sufficient evidence existed to support the first degree murder conviction where appellant confessed to killing the victim and the victim had been stabbed numerous times); *see also, Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335 (1995) (use of a deadly weapon on a vital part of the body was sufficient to sustain the

12. The pathologist further testified that the stab wounds were superficial and were not a cause of the victim's death.

first degree murder conviction). Hence the evidence is sufficient to support the conviction.

## II. Suppression of Statements

■ Appellant next argues that the trial court erred in refusing to suppress both the verbal and videotaped statements that he made to the Erie detectives in Cleveland. When reviewing a suppression ruling, we are bound by those facts available to the suppression court which are supported by the record and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). When properly viewed under these standards, appellant's claims challenging the suppression order must fail.

■ Appellant first claims that his oral and videotaped statements should have been suppressed on the basis that his failure to speak to the Cleveland police concerning the homicide after they twice advised him of his *Miranda* rights was legally tantamount to an invocation of his right to remain silent. However, testimony at the suppression hearing established that appellant never invoked his *Miranda* rights, either explicitly or implicitly, by his refusal to answer questions. To the contrary, although appellant attempts to portray this as a "refusal" to answer police interrogation, the evidence shows that appellant was never given the opportunity to *respond* to questioning concerning the homicide as the Cleveland police awaited the arrival of the investigators from the Erie police department. This Court has held that where a defendant neither explicitly invokes his *Miranda* rights nor declines to answer questions asked of him, there is no invocation of those rights. *Commonwealth v. Beavers*, 492 Pa. 522, 532, 424 A.2d 1313, 1318 (1981). However, when appellant was subsequently interrogated by the *Erie* police, he explicitly waived his rights under *Miranda* on two occasions. Accordingly, the statements were not taken in violation of appellant's *Miranda* rights.

Appellant also alleges that, because he was not arraigned on the murder charge until over a week after his arrest on that charge, his statements should have been suppressed because they were taken in violation of the "six-hour rule." In *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), this Court stated that if an accused is not arraigned within six hours of arrest, any statement obtained after arrest but before arraignment shall not be admissible at trial. However, in *Commonwealth v. D'Amato*, 514 Pa. 471, 486, 526 A.2d 300, 307 (1987), this Court determined that in cases in which the defendant is arrested at a significant distance outside the jurisdiction in which the crime was committed, "it would be the height of folly" to strictly adhere to the six-hour time limit set forth in *Davenport*. In *D'Amato*, as in the current situation, the defendant was arrested in Ohio for a crime which had been committed in Pennsylvania. The *D'Amato* Court held that, under such circumstances:

> Whatever validity the *Davenport* rule retains, its "six-hour clock" does not begin to run in such circumstances until the defendant has been returned to the judicial district wherein the arrest warrant was issued.

*Id.* at 487, 526 A.2d at 307.

In the instant case, appellant was formally arrested at 9:20 p.m. on January 26, 1994 by the Cleveland police on charges of receiving stolen property. Upon arrival of the Erie investigators at 3:00 a.m. on January 27, 1994, appellant was then questioned regarding the murder in Erie. Appellant gave the investigators two statements, one of which was videotaped, in which he confessed to that murder, beginning at 3:30 a.m. and ending at 5:30 a.m.

■ Based upon this confession, an arrest warrant charging appellant with the homicide of Elizabeth Smith was sworn out the morning of January 27, 1994, in Erie and brought to Cleveland for use as an extradition detainer that same day. On Monday, January 31, 1994, upon learning that appellant waived extradition to Pennsylvania, Erie detectives arranged

to return to Cleveland and transport appellant back to Pennsylvania on February 3, 1994. Upon returning to Erie County, appellant was taken directly to a district justice and arraigned on the homicide charge and related charges. Because appellant was arraigned well within six hours of his return to the jurisdiction in which the crime was committed, the six-hour rule was not violated. *Id.* *See also Commonwealth v. Bond,* 539 Pa. 299, 652 A.2d 308 (1995) (the six-hour clock begins to run at the time of arrest on a specific charge and is not altered by the fact that appellant was in custody for a different offense at the time he was arrested for the instant murder).[13] Therefore, the trial court did not err in denying appellant's motion to suppress the statements made in Cleveland.[14]

### III. Voir Dire Questions

■ Appellant next claims that the trial court erred in precluding him from asking certain questions of the jury venire on *voir dire*. The scope of *voir dire* is within the discretion of the trial judge. *Commonwealth v. Paolello,* 542 Pa. 47, 78, 665 A.2d 439, 455 (1995). The purpose of *voir dire* is to ensure the empaneling of a fair and impartial jury capable of following the instructions on the law as provided by the trial court. *Commonwealth v. Jermyn,* 533 Pa. 194, 620 A.2d 1128 (1993), *cert. denied,* 510 U.S. 1049, 114 S.Ct. 703, 126 L.Ed.2d 669 (1994).

The first question which the trial court excluded from *voir dire* was whether the potential jurors were aware that in Pennsylvania a sentence of life imprisonment meant life im-

---

**13.** In *Bond, supra,* the appellant was arrested for a crime other than the one for which he was on trial and was charged two days later with the murder for which he was tried. The appellant in *Bond* did not make the challenged statement until several hours after he was arrested on murder charges. In the present case, appellant had not been charged with murder at the time he confessed to the murder of Elizabeth Smith.

**14.** Appellant further claims that, absent this improper evidence, the verdict was against the weight of the evidence. However, as the evidence was properly admitted at trial, this claim is meritless.

prisonment without the possibility of parole.[15] That question was included on a list of proposed *voir dire* questions submitted by appellant to the trial court but was excluded from the jury questionnaire.[16] Appellant claims that this exclusion produced a jury that was "conviction prone" as well as "death penalty prone," thereby depriving him of a fair trial.[17]

Pursuant to the due process clause of the Fourteenth Amendment of the United States Constitution, a defendant in a capital case is permitted to pose "life-qualification" questions during voir dire in order to prevent the service of a juror who is incapable of returning a verdict of life imprisonment. *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). However, questioning potential jurors regarding their personal knowledge of the law in Pennsylvania does not aid in the inquiry of whether they will be able to follow the law applicable to the matter as instructed by the trial court. A review of the record indicates that each potential juror filled out a questionnaire which elicited information relating each individual's beliefs regarding life imprisonment or the death penalty and whether each potential juror would be able to follow the judge's instructions pertaining to the law applicable to the case. Further, each prospective juror was

15. The actual proposed question was, "Is there any doubt in your mind that life without the possibility of parole means just that?" In addition, many of the questions trial counsel proposed concerning the jurors' ability to determine the sentence were phrased in terms of a choice between "life without the possibility of parole" or the death penalty.

16. The record indicates that it was only after the first juror had been questioned and approved that appellant's counsel asked the judge why the question regarding life without parole was deleted. The court responded that although the question was deleted from the proposed *voir dire*, the defense was not precluded from presenting the question during the penalty phase if appropriate. N.T 10/17/94 at 22. Counsel failed to object at that time to the court's refusal to include the requested question, and therefore, failed to preserve the issue for appeal. It is to be noted that such a question standing alone is misleading in that it ignores the Governor's inherent constitutional ability to commute a life sentence and allow the individual the equivalent conditions as if he were merely paroled. In any event, a review of the claim indicates it is meritless.

17. Appellant does not challenge the propriety of "death-qualifying" the jury.

questioned individually by the court and each attorney. Appellant has failed in his burden to demonstrate how the excluded question would have advanced the appropriate inquiry or how the exclusion of the requested question resulted in a jury which was not fair and impartial. Therefore, this claim is meritless.

The second issue which appellant claims he should have been permitted to explore on *voir dire* was each potential jurors' possible racial bias. Appellant's request to question the jurors during *voir dire* concerning racial bias was not included in appellant's proposed *voir dire* questions. However, during *voir dire*, after six jurors had been empaneled and a total of thirteen questioned, appellant's counsel stated to the trial court, following an off the record sidebar,

> Judge, I had asked for permission to make a record based upon the sidebar we had relative to the question of Mr. Marrero's race. I had requested—I did not include this in my proposed voir dire to The Court, a question that Mr. Marrero is of Hispanic descent and that the victim in this case is white. I believe—or at least I would like to request permission from The Court—not that I ask, but that The Court ask the question relative to race.

N.T. 10/17/95 at 95.[18] Although appellant did not identify on the record any specific "question relative to race" that he wished to ask the venirepersons, he nonetheless claims that inquiry into whether such bias existed was necessary because appellant was a Hispanic male charged with a capital offense against an elderly white female.

 This Court has held that *voir dire* inquiry into the racial bias of prospective jurors is normally required only

18. There is no indication in the record what gave rise to counsel's belated request for such a question in the middle, as opposed to the beginning, of *voir dire*. The trial court, as discussed *infra*, denied counsel's request and made no ruling or comment regarding the timeliness of counsel's request. Furthermore, although appellant claims in the statement of questions presented in his brief that potential jurors should have also been questioned regarding bias based on age and ethnicity, appellant failed to raise this concern at trial or to develop it in his argument to this Court.

where there are special circumstances in the case, other than the different races of the victim and the defendant, which makes it racially sensitive. *Commonwealth v. Richardson,* 504 Pa. 358, 362, 473 A.2d 1361, 1363 (1984) (the mere fact that a black man was charged with raping a white woman did not imbue the case with heightened racial sensitivity requiring specific *voir dire* on racial bias); *but see, Commonwealth v. Glaspy,* 532 Pa. 572, 576–78, 616 A.2d 1359, 1360–61 (1992) (new trial was warranted where trial court denied request for specific *voir dire* on racial bias after a potential juror introduced racial issues into the case by stating that he could not be fair due to the race of the defendant and the victim); *Commonwealth v. Christian,* 480 Pa. 131, 136–37, 389 A.2d 545, 547–48 (1978) (a new trial was warranted in the prosecution of a black man for the rape of a white woman where the trial court prohibited the defendant from asking potential jurors questions regarding their opinions of interracial relationships and sexual inclinations of black men); *Commonwealth v. Brown,* 464 Pa. 625, 347 A.2d 716 (1975) (the trial court erred in not allowing the defendant to ask potential jurors in the trial of a black man for the rape of a white girl if they were bothered by seeing interracial couples; overruled as regards specificity of questions by *Richardson, supra* ); *Commonwealth v. Segers,* 460 Pa. 149, 156, 331 A.2d 462, 466 (1975) (while the trial court was not required to ask potential jurors in a first degree murder case if they had moved from certain neighborhoods because black people had moved in, it was required to question the potential jurors regarding racial bias in general).

Here, the issue of possible racial bias was not brought before the court, nor were there any "special considerations" or circumstances, other than the mere fact of disparate race between the perpetrator and the victim, that gave rise to the issue of possible racial bias. If there was an issue of racial bias, it was only invoked by the belated request to question the venirepersons regarding their biases, and this only after six jurors were seated. Appellant never placed on the record

the reasons for his belated request nor did he point out any reason that gave rise to his request.[19]

## IV. Prosecutorial Misconduct

 Appellant next claims that the trial court erred in denying appellant's motion for a mistrial during the penalty phase of trial when the prosecutor told the jury that "life without parole" in Pennsylvania includes the possibility of a chance for executive clemency. Prosecutorial comments which are allegedly improper must be considered in the context in which they were made. *Commonwealth v. Clayton,*

**19.** A majority of the United States Supreme Court held in *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), that where the defendant has been charged with a capital crime and the defendant and the victim are of different races such a situation amounts to special circumstances allowing the defendant to question the jury regarding possible racial bias. In *Turner,* the defendant was black and was charged with capital murder for fatally shooting a white proprietor of a jewelry store in Virginia. The trial judge precluded the defense from asking potential jurors during *voir dire* questions regarding racial prejudice. The jury convicted the defendant and sentenced him to death. The United States Supreme Court reversed the sentence, holding that the wider range of discretion available to capital juries in the sentencing phase than to juries on non-capital cases and the serious and final nature of the imposition of the death penalty constituted special circumstances warranting further investigation into potential jurors' potential racial biases. *Id.* at 35–36, 106 S.Ct. at 1687–88.

However, the sentencing statute in *Turner* provided the jury with considerably broader discretion in sentencing than is provided to capital juries in this Commonwealth. In order to impose the death sentence, a Virginia jury was required to find either that the defendant was likely to commit future violent crimes or that the crime itself was "outrageously or wantonly vile, horrible or inhumane in that it involved torture, depravity of mind or an aggravated battery to the victim." *Id.* at 34, 106 S.Ct. at 1687 (*citing* Va.Code § 19.2–264.2 (1983)). Where a jury is permitted or required to consider the future dangerousness of a defendant, the Supreme Court held that racial bias is likely to impact on that consideration such that inquiry into racial bias should be permitted. In Pennsylvania, however, future dangerousness is not an aggravating circumstance under Pennsylvania's death penalty statute, and therefore is not a valid factor to be considered by the jury. *Commonwealth v. Christy,* 540 Pa. 192, 206 n. 7, 656 A.2d 877, 883 n. 7 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995); 42 Pa.C.S. § 9711. Because the aggravating factors in Pennsylvania all relate to either specific past crimes of the defendant or to the specific circumstances of the crime for which sentence is being imposed, Pennsylvania capital juries do not have the unfettered discretion with which the United States Supreme Court was concerned.

516 Pa. 263, 285, 532 A.2d 385, 396 (1987), *cert. denied,* 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988).

A review of the record indicates that during the penalty phase appellant's counsel requested a jury instruction that "life" in Pennsylvania means "life without parole." The trial court granted the request over a Commonwealth objection. The Commonwealth then requested that the trial court couple appellant's instruction with an instruction regarding the possibility of commutation in Pennsylvania. The trial court granted the Commonwealth's request and agreed that both parties would be permitted to address the issue in their closing arguments.

As part of its closing, the Commonwealth stated that it anticipated that defense counsel would argue to the jury that because a life sentence precludes the possibility of parole, the jury need not worry about the defendant hurting anyone else. The Commonwealth further stated that, while a life sentence did not allow for the possibility of parole, there was the possibility that the governor would commute the defendant's sentence. Finally, the Commonwealth informed the jury that such considerations were beyond the scope of the jury's consideration and that the jury should not rely on them in reaching a sentencing determination. We find that these comments were a fair response to defense counsel's anticipated argument that a life sentence meant that appellant would spend his entire life in prison.[20] *Clayton, supra* at 283–87, 532 A.2d at 395–97 (prosecutor's statement that "people who are sentenced to life imprisonment do not often spend their entire life in jail" was fair response to inaccurate and misleading statement by defense counsel that commutation was statistically rare).

**20.** Although defense counsel in fact merely stated in his closing argument that the trial court would instruct the jury regarding life without the possibility of parole, defense counsel had requested and been granted permission to present argument on that issue during summation. Because the prosecutor made his closing argument first, he could not have been aware of the limited scope of defense counsel's reference to this issue.

■ Moreover, any prejudice caused by the prosecutor's statement was cured by an instruction from the trial court. After the Commonwealth had concluded its closing argument, appellant's counsel objected to the reference to future dangerousness. The trial court determined that the statement regarding future dangerousness exceeded the trial court's ruling that the Commonwealth could address the possibility of commutation. As a result of that determination, the trial court instructed the jury not to consider future dangerousness. The jury is presumed to follow the court's instructions. *Commonwealth v. Steele*, 522 Pa. 61, 78, 559 A.2d 904, 913 (1989). Furthermore, although trial counsel had initially requested a mistrial, he did not object to the trial court's decision to give a cautionary instruction instead and did not argue that the instruction given was inadequate. Therefore, appellant's claim that the trial court erred in denying his request for a mistrial is meritless. *Commonwealth v. Johnson*, 542 Pa. 384, 399, 668 A.2d 97, 104 (1995), *cert. denied*, ⸻ U.S. ⸻, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996) (appellant cannot claim trial court error for failing to grant relief which appellant failed to pursue).

Appellant also argues that the trial court erred in not instructing the jury that "life" in Pennsylvania means "life without parole." Defense counsel stated in his summation that the trial court would instruct the jury that a life sentence does not include the possibility of parole. However, following closing arguments and after being reminded by the trial court that any instruction regarding the meaning of a life sentence would include the possibility of clemency, appellant withdrew the request for a jury instruction on the meaning of a life sentence. Having requested that the trial court not instruct on this matter, appellant has no basis upon which to complain in an attempt to overcome his clear waiver of the issue. Appellant cannot have it both ways; he should have either proceeded with the instruction and thereafter preserved for appeal the issue of whether the trial court erred on giving the clemency instruction, or withdrawn his instruction request and foregone a challenge based upon the clemency issue. A litigant cannot wait until the verdict to claim trial error.

### V. Weight of the Evidence—Penalty Phase

 Appellant contends that the penalty phase verdict was against the weight of the evidence. Specifically, he asserts that no reasonable jury could have fairly concluded that the one aggravating factor outweighed the one mitigating factor so as to warrant the death penalty. He argues that the verdict could have only been the result of confusion, bias or prejudice. In capital prosecutions it is exclusively for the jury to determine whether any mitigating factors exist, and if so, whether they outweigh credible aggravating circumstances. *Mitchell, supra* at 556, 599 A.2d at 629.

 In the instant case, the record clearly shows that the jury found an aggravating circumstance under 42 Pa.C.S. § 9711(d)(6), that appellant committed the murder while committing a felony (burglary). The jury further found the mitigating circumstance under 42 Pa.C.S. § 9711(e)(8), that appellant's personality changed when he was intoxicated by alcohol. However, the jury found that the aggravating circumstance outweighed the mitigating circumstance and on October 25, 1994, the trial court imposed the jury's sentence of death for the first degree murder conviction and additionally sentenced appellant to serve an aggregate term of 6 to 12 years imprisonment. This Court cannot substitute its judgment for that of the fact finder when nothing in the record suggests that the jury considered any improper sentencing factors.

### VI. Proportionality Review

 Finally, pursuant to our statutory obligation, we have reviewed the sentence of death and the record and have determined that it is not the product of passion, prejudice or any other arbitrary factor. There was sufficient evidence to support the aggravating circumstance found by the jury. In particular, the fact that a Nintendo game set and several pieces of jewelry having a total value of $2,000 or more were missing from the victim's residence and were later found in

appellant's possession provide sufficient evidence that appellant, in addition to brutally murdering this elderly victim, burglarized and ransacked her apartment.

Furthermore, as this Court has mandated, we have conducted our own proportionality review by independently examining similar cases,[21] by reviewing the facts underlying the first degree murder, and by considering the sentencing data compiled by the Administrative Office of the Pennsylvania Courts pertaining to similar cases and conclude that the sentence of death imposed upon appellant is not excessive or disproportionate to the sentences imposed in similar cases. *See Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08, *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

**21.** *Commonwealth v. Rainey*, 540 Pa. 220, 656 A.2d 1326, *cert. denied*, —— U.S. ——, 116 S.Ct. 562, 133 L.Ed.2d 488 (1995) (judgment of sentence of death affirmed where jury found as aggravating circumstance that appellant was attempting to rob the seventy-four year-old victim when he shot him point-blank in the back with a sawed-off shotgun and as mitigating circumstances appellant's age and lack of significant history of criminal convictions); *Commonwealth v. Thompson*, 538 Pa. 297, 648 A.2d 315 (1994) (judgment of sentence affirmed where jury found as aggravating circumstance that appellant killed victim in attempt to get money and a mitigating circumstance under the catchall exception); *Commonwealth v. Conforti*, 533 Pa. 530, 626 A.2d 129 (1993) (judgment of sentence of death affirmed where jury found as aggravating circumstance that appellant killed victim during rape and kidnapping and as mitigating circumstance the appellant's lack of significant criminal history and his physical impairment and mental state at the time of the crime); *Commonwealth v. Crispell*, 530 Pa. 234, 608 A.2d 18 (1992) (judgment of sentence of death affirmed where jury found as aggravating circumstance that appellant kidnapped the victim and stole her car before killing her and as mitigating circumstances the appellant's age and remorse); *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987) (judgment of sentence of death affirmed where jury found as aggravating circumstance that appellant killed his mother during an arson and as mitigating circumstances that appellant did not have a significant criminal history, that appellant was under extreme mental or emotional disturbance at the time of the crime and a mitigating circumstance under the catchall exception); and *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861 (1990), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992) (judgment of sentence of death affirmed where jury found as aggravating circumstance that appellant killed an elderly security guard while robbing a dinner theater and as mitigating circumstances appellant's age and general character).

Accordingly, we affirm the verdict and sentence of death imposed upon appellant by the Court of Common Pleas of Philadelphia County.[22]

NIX, former C.J., and MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.

CAPPY, J., files a concurring opinion in which FLAHERTY, C.J., joins.

CAPPY, Justice, concurring.

I join in the opinion of the majority with the exception of the majority's interpretation of the United States Supreme Court's opinion in *Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), as expressed in footnote 19. (Opinion at pg. 610).

In *Turner*, seven Justices of the Court agreed that a defendant accused of an interracial capital crime is entitled to voir dire prospective jurors on the issue of racial bias. Of the seven Justices agreeing on that issue, one concurred in the result only, four Justices found that the error in refusing to permit voir dire on racial bias affected only the penalty phase of the proceeding, and two Justices found the error affected both the guilt and penalty phases. The two Justices in the dissent found no error.

The majority opinion herein reads *Turner* as limiting voir dire questions on racial bias to capital cases in jurisdictions where the jury has greater discretion in imposing a death sentence than juries in capital cases in Pennsylvania. It is this limitation of *Turner* with which I cannot agree. In my opinion the holding of *Turner* was not restricted by the range of discretion that a particular sentencing jury wields under the Virginia capital sentencing scheme; rather, the court was focusing upon the greater discretion possessed by penalty

22. Within ninety days of the date the sentence of death is upheld by this Court, the Prothonotary of this Court is directed to transmit to the Governor's office the full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(i).

phase juries as opposed to guilt phase juries. The language of *Turner* which explains this distinction is as follows:

> The inadequacy of voir dire in this case requires that petitioner's death sentence be vacated. It is not necessary, however, that he be retried on the issue of guilt. Our judgment in this case is that there was an unacceptable risk of racial prejudice infecting the *capital sentencing proceeding.* This judgment is based on a conjunction of three factors: the fact that the crime charged involved interracial violence, the broad discretion given the jury at the death-penalty hearing, and the special seriousness of the risk of improper sentencing in a capital case. At the guilt phase of petitioner's trial, the jury had no greater discretion than it would have had if the crime charged had been noncapital murder.

476 U.S. at 37, 106 S.Ct. at 1689 (emphasis in original).

Accordingly, as I do not agree with the views expressed by the majority regarding the *Turner* decision, I write to disassociate myself from that portion of the majority opinion.

FLAHERTY, C.J., joins.