J-S41008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DAVID ISAIAH JETT, | |
| Appellant | No. 14 MDA 2015 |

Appeal from the Judgment of Sentence entered September 11, 2014,
in the Court of Common Pleas of Lycoming County,
Criminal Division, at No(s): CP-41-CR-0000036-2014

BEFORE:  ALLEN, LAZARUS, and PLATT*, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED JUNE 26, 2015**

David Isaiah Jett ("Appellant") appeals from the judgment of sentence imposed after a jury convicted him of robbery, simple assault, theft by unlawful taking, and receiving stolen property.[1]

The facts adduced at trial are as follows:  Desaree Wykoff was working at the Quick Mart on Northway Road in Williamsport on the evening of December 15, 2012, when "a masked man with a gun" entered the store. N.T. (Jury Trial), 6/16/14, at 11.  The man, who was wearing black pants, a blue hoodie and a black jacket, demanded money.  *Id*. at 12-15.  Ms. Wykoff gave the man "around $600" from a cash register and the man put the money in what looked like a black pillow case and left.  *Id*. at 13.  Ms.

---

[1] 18 Pa.C.S. §§ 3701(a), 2701(a), 3921(a), and 3925(a), respectively.

*Retired Senior Judge assigned to Superior Court.

Wykoff testified that she was scared, and although the robbery lasted "maybe 45 seconds to a minute", it "felt like it took forever." *Id*. at 14.

Jamison Markham testified to being friends with Appellant. *Id*. at 21-22. Mr. Markham was with Appellant during the afternoon and evening on December 15, 2012, the day the Quick Mart was robbed. *Id*. at 22-23. Appellant left Mr. Markham's home that day but returned around 8:30 p.m. *Id*. at 23. He was wearing black jeans and a blue hoodie. *Id*. Appellant told Mr. Markham that "he robbed the uni-mart, and showed [Mr. Markham] a wad full of cash, maybe about $500." *Id*. The day prior, Appellant had told Mr. Markham that he was going to commit the robbery but Mr. Markham "thought he was joking." *Id*. at 24. When Appellant stated that he had committed the robbery, another individual, Nicole Baney, was present. *Id*. at 24-25. When Appellant left Mr. Markham's residence, he had changed from his blue hoodie to a black puffy jacket, and took with him his black gym bag. *Id*. at 25.

Christine Marie Fye testified to being employed as a forensics services member of the Pennsylvania State Police. Ms. Fye was called to recover a firearm discovered behind Mr. Markham's house by his neighbors. *Id*. at 37. Ms. Fye processed the firearm to maintain its integrity as evidence. *Id*. at 38-39.

Nicole Baney testified to being acquainted with Appellant through Mr. Markham. *Id*. at 41-42. Ms. Baney was "hanging out" with Mr. Markham at his home on the evening of the robbery when Appellant arrived. *Id*. at 43.

Ms. Baney denied that Appellant made any statements to her about his whereabouts that evening; however, Ms. Baney testified that Appellant changed clothes, and put his blue hoodie in a black drawstring bag. *Id*. at 44. She also saw Appellant with "a roll of money" in his hand. *Id*. at 45.

Leroy Starr testified to being friendly with Appellant. *Id*. at 50. Mr. Starr stated that Appellant told him about his plan to rob a uni-mart approximately "three months before he did it." *Id*. Mr. Starr testified that Appellant asked him to find him a gun, asked Mr. Starr's girlfriend to find him a gun, and asked Mr. Starr to be his getaway driver. *Id*. at 51. Mr. Starr testified that he never participated in the robbery, even though he knew about it. *Id*. at 52. He also testified that his "really good friend", Maurice Williams, was originally arrested for the robbery, but Mr. Starr did not come forward to disclose what he knew about Appellant until Appellant "got out of jail and … called [Mr. Starr] and said that he was going to shoot [Mr. Starr and his girlfriend] at the time if [Mr. Starr] didn't keep his .. name out." *Id*. After Appellant threatened Mr. Starr, Mr. Starr called Pennsylvania State Trooper Havens. *Id*. at 52, 55. Mr. Starr testified that even though he was good friends with Maurice Williams and knew he was wrongfully arrested for the robbery, he did not come forward with information about Appellant at first because Mr. Starr "did not want to be involved in this case. Because [Mr. Starr] had [his] own problems at the time … [and] just wanted to worry about [himself]." *Id*. at 58.

Mary Catherine Fitzpatrick testified to being Mr. Starr's girlfriend at the time of the robbery and knowing Appellant. *Id*. at 60. Ms. Fitzpatrick said that Appellant "was talking about robbing a store" and told her "he needed a gun." *Id*. She confirmed that Appellant asked Mr. Starr for a ride after the robbery, but that "the night it went down [Mr. Starr] called [me] and I just told him not to go pick [Appellant] up and [Mr. Starr] didn't." *Id*. at 60-61. Ms. Fitzpatrick testified that after the robbery, she saw Appellant, who gave her "a dirty look", and called Mr. Starr and "was making all these threats, saying if we talked to the cops saying that he robbed the uni-mart he was going to shoot up our house." *Id*. at 62. Ms. Fitzpatrick said she heard the threats on Mr. Starr's speakerphone. *Id*. at 63.

Pennsylvania State Trooper Tyson Havens testified to investigating the December 15, 2012 robbery of the Quick Mart. Trooper Havens explained that he initially and wrongly arrested Maurice Williams for the robbery based on the eyewitness account of a Quick Mart customer who was the last customer in the Quick Mart, approximately eight minutes prior to the robbery. *Id*. at 67. Upon further investigation, Trooper Havens concluded that the eyewitness was not credible, that Maurice Williams had not committed the robbery, and asked the district attorney to dismiss the charges against Mr. Williams. *Id*. at 70.

Trooper Havens testified that the day he arrested Maurice Williams, Ms. Fye told him about the gun found behind Mr. Markham's house. *Id*. at

91. Trooper Havens went to Mr. Markham's house the next day, and related:

His mom said I was going to railroad him. He just didn't – he's typical of the kids in that community. They're – they're street kids and they don't like police and they don't want their friends seeing them talking to police so they put up a fight every time we come around to talk.

*Id*. at 92. Trooper Havens explained that he "kept getting interrupted" by Mr. Markham's mother, so he and Mr. Markham continued the interview at the police station, where Mr. Markham told Trooper Havens he "wrongly arrested his best friend [Maurice Williams]" and "didn't call [Trooper Havens] to know his best friend was sitting in jail." *Id*. at 92-93.

Trooper Havens also interviewed Nicole Baney, who indicated that she saw Appellant the night of the robbery and he was wearing black pants and a hoodie. *Id*. at 98-99.

After Appellant was identified as the robber, Trooper Havens interviewed Appellant and apprised him of his ***Miranda*** rights. *Id*. at 78. He also obtained Appellant's permission to record the interview. *Id*. Appellant admitted to knowing about the robbery because he frequented the Quick Mart and had family that lived nearby. *Id*. at 79. When asked about his relationship with Mr. Markham, Appellant stated that they did not "have a good history" because Appellant had picked on Mr. Markham in school and had "had sex with one or two" of Mr. Markham's girlfriends. *Id*. at 80. Nonetheless, Appellant admitted being at Mr. Markham's home on the night

of the robbery, but then recanted and said he was there only in "the morning or during the daytime." ***Id***. at 81. Upon telling Appellant that "all his pals" were saying Appellant robbed the Quick Mart, Trooper Havens testified:

> I fully expected him to be upset and angry that the people are assuming he [did] it. I expected him to be angry that people are accusing him of committing a robbery. He wasn't angry at all. He was indifferent. He didn't – he didn't seem to care … One of the things he said was, that's the way the cookie crumbles.
>
> I went and interviewed him after we had … the piece of the firearm. …. After we recovered that piece of the firearm I sent that piece of that firearm to our DNA lab to be tested for DNA. . . . I told [Appellant] that I wanted to get a sample of his DNA and I said, this will clear you if you didn't do it. He said he didn't do it. [I said,] if you didn't commit this robbery and your DNA is not going to be on the gun, give me your DNA, I'll send it to the lab, they'll compare it against the DNA on the gun and it'll clear you. And he told me no.

***Id***. at 83-85.

Trooper Havens also testified that in a recorded conversation from the Lycoming County Jail, Appellant's grandmother asked about moving Appellant's clothing, and Appellant talked about his hats. ***Id***. at 77; Commonwealth Exhibit 4. Appellant's grandmother asked "about the black hat with the eyes cut out", after which Appellant "quickly stops her and says no, not that one, and then moves on." ***Id***.

Pennsylvania State Trooper Kenneth Davis testified to interviewing Mr. Markham, who indicated that Appellant had told him of his intention to rob the uni-mart. *Id*. at 120. Mr. Markham also indicated that "Nicole"[2] was present when Appellant said he committed the robbery. *Id*. at 121-123. Mr. Markham provided Trooper Davis with the names of "DJ Starr" and Mary Fitzpatrick. *Id*. at 123-124.

The jury returned its guilty verdicts at the close of trial on June 16, 2014. On September 11, 2014, the trial court sentenced Appellant to 72 to 144 months of incarceration on the robbery charge; the trial court found that the remaining charges merged for sentencing purposes.

Appellant filed a motion for post-sentence relief on September 15, 2014, which the trial court denied by opinion and order dated December 19, 2014. Appellant filed a timely appeal. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises three issues for appellate review:

   I.   WHETHER THE TRIAL COURT ERRED IN ALLOWING THE
        COMMONWEALTH TO PRESENT AN IMPROPER CLOSING
        ARGUMENT, IN THAT THE PROSECUTOR EXPRESSED A
        PERSONAL BELIEF ABOUT THE CREDIBILITY OF HIS NON-
        LAW ENFORCEMENT WITNESSES WHICH PREJUDICED THE
        JURY?

   II.  WHETHER THE EVIDENCE PRESENTED BY THE
        COMMONWEALTH AT TRIAL WAS INSUFFICIENT TO

---

[2] Trooper Davis testified that Mr. Markham refused to disclose Nicole's last name to him.

- 7 -

ESTABLISH THE ELEMENTS OF EACH OF THE OFFENSES CHARGED WHEN THERE WAS NO COMPETENT EVIDENCE TO ESTABLISH [APPELLANT] AS THE INDIVIDUAL WHO COMMITTED THE ROBBERY?

III. WHETHER THE VERDICT OF THE JURY WAS AGAINST THE WEIGHT OF THE EVIDENCE WHEN THERE WAS NO COMPETENT EVIDENCE TO ESTABLISH THAT [APPELLANT] WAS THE INDIVIDUAL WHO COMMITTED THE ROBBERY AND THERE WERE MULTIPLE INCONSISTENT STATEMENTS BY ALL OF THE COMMONWEALTH'S NON-LAW ENFORCEMENT WITNESSES?

Appellant's Brief at 7.

In his first issue, Appellant asserts that "the prosecutor improperly and shamelessly vouched for the credibility of its police witness throughout his summation." Appellant's Brief at 23. Appellant also contends "the prosecutor repeatedly and improperly vouched for the credibility of its lay witness through his summation." *Id*. at 25. Appellant maintains that the prosecutor's improper comments prevented him from obtaining a fair trial. *Id*. at 26. We disagree.

We first note that our review of the transcript from the June 16, 2014 closing arguments reveals that Appellant's counsel never objected to the prosecutor's closing statements. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Montalvo*, 956 A.2d 926, 936 (Pa. 2008) (noting the general rule that in order to preserve a claim on appeal, a party must lodge a timely objection at trial, and quoting *Commonwealth v. May*, 887 A.2d 750, 758 (Pa. 2005) ("To the extent the claims would sound in trial

court error, they are waived due to the absence of contemporaneous objections.)).

Waiver notwithstanding, Appellant's claim is meritless. Appellant cites as improper the following portions of the prosecution's closing remarks:

> [Trooper] Havens . . . had the opportunity to explain why he had arrested the wrong person. . . . And you know what? Thank goodness we have troopers who are willing to say, I ma[d]e a mistake, because otherwise the criminal justice system would be a sham and a fraud.
>
> But Havens said, hey, to the District Attorney's Office, after further investigation, after talking to more people, after investigating the eyewitness and his credibility, we realize that we made a big mistake.
>
> . . .
>
> [Trooper] Havens through his further investigation decided . . . after he looked at the witness statements, the surveillance, and realized that [Appellant] was the culprit.
>
> . . .
>
> [Appellant] also gives away, in the opinion of the Commonwealth that his demeanor gives himself away. One would suspect an individual who is being accused of a crime who didn't do it and who is being lied about by multipole [sic] different people that he thought was his friends, one would suspect that he would be outraged, that he would be shocked and that he would be in awe. And yet, what does [Trooper] Havens say? He just kind of sat there and he said something along the lines of, well, that's the way the cookie crumbles, I guess. It's not the statement of an individual who is wrongly accused. It's not the statement of an individual who is being railroaded by five of his good friends. It's the demeanor and it's the statement of an individual who's guilty and who knows he's guilty and knows he has been caught.
>
> . . .
>
> And last, but not least . . . Trooper Havens, says listen, we have technology now. We have DNA. We can have the ability to take your DNA and send it to the lab and through touch DNA, if you

didn't touch the gun, if you weren't involved in this case, then I can take your DNA; your DNA is not going to be on it, and you will be exonerated, you will be absolved and we will finally show that these people are lying. And what's his answer. . . . No.

But it would help in the case. Can I have your DNA? No. It would prove that everybody's lying in this case. Can I have your DNA? No. . . . And he knew the DNA, at least in his mind, was going to tell the truth.

*\*\**

All of the witnesses that took the stand have something in common. And I'm not sure what the defense theory is, but it's got to be that all of the defense witnesses are lying, and I guess they would have to be lying for a reason, but what's the motive? What hasn't really been shown aside from, well, they were all connected to the guy who was arrested first and they were friends with him, but I submit that it shows that that proves their credibility because here's their friend who is wrongly arrested and everybody sort of goes, (whistles), like, hides their eyes, goes back into the shadows and says, I don't want to get involved. And people don't want to get involved in this type of case because it's messy.

. . .

None of these folks involved had a reason to be making up their stories, to come in and purger themselves, be – put themselves at a risk of being charged criminally themselves. And I submit to you that none of the witnesses of the civilians were that smart. They weren't sophisticated. They just came in and answered the questions and told you what happened.

Appellant's Brief at 23-26, citing N.T. (Jury Charge), 6/16/14, at 19-26.

In responding to Appellant's claim, the trial court explained:

Here, Defense Counsel highlighted the inconsistencies in the testimony of the Commonwealth's witnesses. She asked the jury, "Who do you believe? What do you believe?" N.T., 6/16/14, at 12 (Closing Arguments). The prosecutor's comments on the credibility of the Commonwealth's witnesses were responses to Defense Counsel's arguments. The "telling

- 10 -

the truth" comments are oratorical flair, and they do not exceed the bounds of a logically forceful and vigorous response.

Trial Court Opinion, 12/19/14, at 11.

Our Supreme Court has summarized:

It is, of course, well-settled that the prosecutor may fairly respond to points made in the defense closing. *See Commonwealth v. Trivigno,* 561 Pa. 232, 750 A.2d 243, 249 (2000) (plurality opinion) ("A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel") (citing *United States v. Robinson,* 485 U.S. 25, 31, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988)); *Commonwealth v. Marrero,* 546 Pa. 596, 687 A.2d 1102, 1109 (1996). Moreover, . . . "prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 514 (1995). We also noted that it is settled that the prosecutor may comment on credibility**,** as long as the comment does not involve an assertion of personal opinion. *Id.* at 515. Finally, we noted that, in this case, "the trial court instructed the jury in its opening and closing instructions that counsel's statements were not evidence" and, of course, "the jury is presumed to follow instructions." *Id.* at 515 n. 27.

***Commonwealth v. Jones***, 811 A.2d 994, 1006 (Pa. 2002).

Here, at the commencement of trial, the trial court advised the jury, "keep in mind when the attorneys speak in court … they're not presenting evidence, they're not proving anything. It's through witnesses, testimony, demonstrative evidence such as photographs, videos, that's the evidence. You are the finders of fact." N.T. (Jury Trial), 6/16/14, at 5. At the conclusion of testimony, in charging the jury, the trial court again advised the jury, at length, that they were "the sole judges of the credibility of the

- 11 -

witnesses and their testimony." N.T. (Jury Charge), 6/16/14, at 14-15. The trial court stated:

> Now, as I indicated to you, the speeches of counsel are not part of the evidence and you shouldn't consider them as such. However, in deciding the case you carefully consider the evidence in light of the various reasons and arguments which each lawyer presented. It is the right and duty of each lawyer to discuss the evidence in a manner which is most favorable to the side they represent. You should be guided by each lawyer's arguments to the extent that they are supported by the evidence and insofar as they aid you in applying your own reason and common sense. However, you're not required to accept the arguments of either lawyer. It's for you, and you alone, to decide the case based on the evidence presented from the witness stand and in accordance with the instructions that I'm now giving to you.

*Id*. at 18-19.

Given the foregoing, we reject Appellant's assertion that he was deprived of a fair trial due to prosecutorial misconduct.

In his next issue, Appellant asserts that the evidence was insufficient to support his convictions "where there was no competent evidence to establish [Appellant] as the individual who committed the robbery." Appellant's Brief at 27. Appellant does not reference the statutory elements of robbery or the other offenses of which he was convicted; rather, he claims that the evidence was insufficient because of "multiple inconsistent statements" between Ms. Wykoff, Mr. Markham, Ms. Baney, Mr. Starr, Trooper Havens and Trooper Davis. *Id*. at 27-31. Upon review, we conclude that Appellant's singular focus on the credibility of witness testimony constitutes a challenge to the weight of the evidence, not its

sufficiency. ***Commonwealth v. Wilson***, 825 A.2d 710, 713-714 (Pa. Super. 2003) ("A sufficiency of the evidence review . . . does not include an assessment of the credibility of the testimony offered by the Commonwealth. Such a claim is more properly characterized as a weight of the evidence of the challenge."). Accordingly, we proceed to Appellant's third issue challenging the weight of the evidence.

In his weight claim, Appellant continues to assail his convictions because "the verdict was so contrary to the evidence to shock one's sense of conscience when there was absolutely no physical evidence tying him to the robbery. What is more shocking even is that all of the non-law enforcement witnesses' accounts of the events were inconsistent…" Appellant's Brief at 33.

We review a weight of the evidence claim according to the following standard:

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [jury] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the [jury's] verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

***Commonwealth v. Tejada***, 103 A.3d 788, 795-796 (Pa. Super. 2015) (citations omitted).

With regard to the role of the jury vis-à-vis inconsistent statements of witnesses:

> It [is] the role of the jury to determine [witness] credibility with respect to … identification. The jury's decision to credit [a witness'] testimony does not render the verdict contrary to the evidence presented. *See Commonwealth v. Sanchez,* 614 Pa. 1, 36 A.3d 24, 39 (2011) ("Issues of witness credibility include questions of[, inter alia,] inconsistent testimony[.]").

***Tejada***, 103 A.3d at 796.

Given our review of the record and applicable legal authority, we find no abuse of discretion by the trial court in concluding that "the verdict does not shock this Court's sense of justice." Trial Court Opinion, 12/19/14, at 14. We therefore find Appellant's weight claim to be without merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/26/2015

- 14 -