J-S01008-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
:             PENNSYLVANIA
:
v.                    :
:
:
ANTHONY UVON STARKS          :
:
Appellant            :    No. 831 MDA 2020

Appeal from the Judgment of Sentence Entered December 31, 2019
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0007085-2018

BEFORE:    LAZARUS, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:               **FILED MARCH 02, 2021**

Anthony Uvon Starks appeals from the judgment of sentence, entered in the Court of Common Pleas of York County, after a jury convicted him of first- and second-degree murder.[1] After our review, we affirm in part and vacate in part.

On October 25, 2018, Tarsha Eaddy drove from her home in Maryland to the King's Inn Motel in York County, Pennsylvania to check on her mother, Edna Pinder ("Decedent"), whom she had been unable to contact for several days. N.T. Jury Trial, 11/19/19, at 99-101. Upon her arrival, Eaddy did not see Decedent's car—which Decedent never loaned to anyone—in the motel's parking lot. *Id.* at 101-02, 111. Eaddy entered the motel through a side

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a) and (b), respectively.

entrance and went upstairs to Decedent's unit, where she knocked on the door. *Id.* at 102-03. Eaddy could hear the television but received no response, so she proceeded to the lobby and asked the front desk clerk to unlock Decedent's door. *Id.* at 103, 105. Upon entering the apartment, Eaddy saw numerous pieces of mail on the floor. *Id.* at 105. As she proceeded further into the apartment, Eaddy saw Decedent in a basket in the corner and began screaming. *Id.* at 107. She testified that Decedent was "slumped against the wall, and her head was positioned to the side in a very unnatural way. There was vomit coming from her mouth and it was very apparent that she was not alive." *Id.* at 107. Eaddy noted that Decedent's cell phone was missing. *Id.* at 109. Eaddy was aware that Decedent had been in a relationship with Starks, but believed that relationship had ended years earlier. *Id.* at 110.

Amber Kress, the Decedent's neighbor, heard Eaddy's screams and went to Decedent's apartment, where she called 9-1-1. *Id.* at 143-44. Kress testified that she had heard screams coming from Decedent's apartment a few days earlier, between 3:00 and 4:00 in the morning, but thought little of it as there was always fighting in the building. *Id.* at 144-45. Kress was familiar with Starks and believed that he had been living with Decedent. *Id.* at 146.

Officer Thomas Ewald of the York City Police Department responded to the scene. Upon entering the Decedent's unit, Officer Ewald observed the Decedent lying in a basket with apparent blood in her mouth. *Id.* at 154. Realizing she was deceased, Officer Ewald called for a supervisor and a

coroner. *Id.* When the coroner arrived, Officer Ewald assisted her in moving the body to the floor, at which time he observed several puncture marks over the Decedent's left breast/heart area. *Id.* at 155. He also observed blood spatter "from the right to the left, where the victim was." *Id.* at 156. He saw blood spatter on the east, west, and north walls of the apartment, as well as a bloody handprint on the bed sheets and small smears of blood on the wall. *Id.* at 156, 159-60. Officer Ewald also observed three empty bottles of vodka and three containers of prescription medication. *Id.* at 159-60. Officer Ewald stated that the unit's window, which was over seven feet from the bedroom floor, was unopened when he arrived on the scene. *Id.* at 162-63.

Deputy Coroner Tanya Zech of the York County Coroner's Office was dispatched to the scene. She testified that she observed "blood splatter, . . . empty vodka bottles, . . . men's boxer briefs, [and a] baseball cap laying on the floor[,] and personal effects." *Id.* at 168. Deputy Coroner Zech observed the Decedent lying in a basket; there was "bloody purge" coming from her mouth and the tips of her fingers and toes were dehydrated and blackened, indicating that she had been there "for a decent amount of time." *Id.* In moving the Decedent's body to the floor to be placed in a body bag, Deputy Coroner Zech observed several wounds and lacerations to the chest. *Id.* at 181. Having observed those wounds, she ceased her assessment and called for detectives, as she believed the Decedent's death to be suspicious. *Id.*

York City Police Detective Daniel Craven responded to the scene in his capacity as a certified crime technician. *Id.* at 192. After being verbally

informed that a search warrant had been obtained for the premises, he entered the Decedent's apartment, performed a walk-through, and began taking photographs. *Id.* at 194. Detective Craven noted that there were blood stains and spatter on the walls, bed sheets, and pillow cases. *Id.* at 198-203. He also observed a black baseball hat, a pair of men's blue boxer shorts, a bag of dirty laundry, and mail addressed to Starks. *Id.* at 202-03. He noted that the window was closed with no signs of forced entry. *Id.* at 200. Detective Craven collected several items from the scene, including: a change of address form dated October 12, 2018, changing Starks' address to the Decedent's residence at the King's Inn Motel, *id.* at 210; mail addressed to Starks from the Social Security Administration, *id.* at 211; two bottles of vodka, *id.* at 215; a cigarette butt, *id.* at 216; and bed sheets and pillowcases. *Id.*

York City Police Detective Christopher Perry served as the lead crime scene technician on the case. #*Id.* at 220. Shortly after arriving at and assessing the scene, Detective Perry left to secure a search warrant. After doing so, he returned to the crime scene. He noted that the front door to the apartment showed no signs of a break-in and that the lock and hinges appeared to be in working order. *Id.* at 224. Similarly, the window was closed and locked from the inside and showed no signs of tampering. *Id.* at 225. Although there was soil on the ground outside the window, there was no evidence inside the apartment of soil or any other material that would suggest entry through the window. *Id.* at 245. Later that night, Detective Perry

learned that the Decedent owned a black Chrysler 200, which was not present in the parking lot of the motel. *Id.* at 228. He entered the vehicle's information into the National Crime Information Computer ("NCIC") to enable a "stop and hold" to be placed on the vehicle in the event it was located. *Id.* On October 31, 2018, Detective Perry was informed that the Decedent's vehicle had been located in Baltimore, Maryland, with Starks behind the wheel. *Id.* at 231. After obtaining a warrant to search the car, Detective Perry recovered a knife, an unopened bottle of bleach, and a towel from the vehicle. *Id.* at 236-37.

Doctor Rameen Starling-Roney, a forensic pathologist, performed the autopsy on Decedent. He concluded that her body was in a state of "mild decomposition" and was past the 12-to-24-hour period of rigor mortis. *Id.* at 267. Toxicology analysis revealed the presence of diphenhydramine, which is the main ingredient in Benadryl, in Decedent's blood, as well as cocaine and alcohol. *Id.* at 266. Doctor Starling-Roney observed eleven stab wounds to the upper-left corner of the chest, one stab wound on the level of the left nipple, one stab wound to the middle chest, and one stab wound on the left forearm—possibly a defensive wound. *Id.* at 268-70. He testified that the cause of death was multiple sharp force injuries and the manner of death was homicide. *Id.* at 271.

Ross Dean, the owner of the King's Inn Motel, testified that he was familiar with Decedent and Starks and believed them to be paramours living together at the motel. *Id.* at 277. Dean testified that the property had a

surveillance system comprised of 16 cameras that recorded 24 hours a day. *Id.* He stated that, during the period of October 21 through 25, 2018, the system was working properly, but that it would not have been unusual for the time stamps to be slightly off. *Id.* at 278. Dean testified that there was a camera positioned such that it would have captured anyone entering or leaving Decedent's apartment door. *Id.* at 281.

Josh Seiple, an employee of a pawn shop in York City called "York Buy Sell Trade," testified that, on October 22, 2018, Starks came into the store at 10:03 a.m. and sold a Samsung S7 Edge cell phone using a Maryland state identification card issued in Starks' name. *Id.* at 284-86.

York City Police Detective Anthony Fetrow subsequently reviewed interior video surveillance footage from York Buy Sell Trade and observed Starks selling the phone to Seiple at approximately 10:00 a.m. on October 22, 2018.[2] *Id.* at 299-301. Detective Fetrow also viewed surveillance video from a nearby convenience store showing Starks exiting Decedent's vehicle and walking in the vicinity of York Buy Sell Trade at approximately 8:11 a.m. on October 22, 2018. *Id.* at 304. A second video from the convenience store showed Starks walking in the direction of the pawn shop at approximately 9:39 a.m. on that same date. *Id.* at 304-05. A third video shows Starks exiting the pawn shop after selling the phone and walking toward the driver's

---

[2] Detective Fetrow testified that the time stamp on the video was approximately 25 minutes behind actual time. N.T. Jury Trial, 11/19/18, at 297.

- 6 -

side of Decedent's vehicle. *Id.* at 305. Detective Fetrow also recovered the phone Starks sold to the pawn shop and confirmed it as Decedent's cell phone. *Id.* at 312.

Detective David Swinney, of the Baltimore County Police Department, testified that he is a member of the warrant task force assigned to the U.S. Marshals' fugitive task force. N.T. Jury Trial, 11/20/18, at 346. In that capacity, he was provided with Starks' name and a description of Decedent's vehicle, as well as information that Starks frequented the area of 25th Street and Greenmount Avenue in Baltimore City. *Id.* at 347-48. On October 31, 2018, Detective Swinney and members of the fugitive task force apprehended Starks while he was driving Decedent's vehicle and placed him under arrest. *Id.* at 349. During a search incident to arrest, Detective Swinney found two credit cards in the Decedent's name in Starks' front pocket. *Id.* at 350.

Finally, York City Police Detective Travis Sowers testified that he interviewed the Decedent's family and confirmed that Decedent was last heard from at 1:32 a.m. on the morning of October 21, 2018, via a text message to her sister. *Id.* at 355-56. Detective Sowers subsequently viewed all surveillance video from King's Inn Motel, beginning from the last time Decedent was known to be alive.[3] *Id.* at 357, 359. Detective Sowers testified that there were no gaps in the footage and that the relevant portions came

---

[3] Detective Sowers testified that he had received information that Decedent was seen at a grocery store at some point on October 21, 2018. He watched the surveillance video from that point until the time police arrived at the apartment on October 25, 2018. N.T. Jury Trial, 11/20/18, at 358-59.

from two cameras—Channel 5, located in the hallway outside Decedent's apartment, and Channel 7, located near an exit of the building near where Decedent's vehicle was parked. *Id.* at 359-60. Detective Sowers compiled the relevant footage on two DVDs, which were admitted as Commonwealth Exhibits 65 (Channel 5) and 66 (Channel 7). *Id.* He testified that the time indicated on the video was twenty minutes behind actual time and that no one other than Decedent and Sowers was ever seen entering Decedent's apartment. *Id.* at 360, 363.

Detective Sowers testified that the first video clip, at 11:23 p.m. on October 21, 2018, showed Starks and the Decedent outside the Decedent's apartment. *Id.* at 361. Starks had just exited the apartment and appeared to be wearing the same jacket he was seen in the next morning at the pawn shop. *Id.* at 362. Approximately seven minutes later, at 11:30 p.m., Starks was seen re-entering Decedent's apartment. *Id.* Twenty minutes after that, at 11:50 p.m., Decedent is seen exiting her unit. *Id.* at 363. Thereafter, at 12:11 a.m. on October 22, 2018, Decedent is seen returning to her apartment. *Id.* at 364. She was never seen alive on video again. *Id.*

Approximately one hour after Decedent was last seen entering her apartment, at 1:11 a.m., Starks is seen exiting the unit alone. *Id.* at 365. Detective Sowers testified that Starks appeared to be walking "much faster" than in previous video clips. *Id.* at 366. Starks is then captured entering the Decedent's vehicle and driving away. *Id.* at 367. Ten minutes later, at 1:22 a.m., Starks is seen re-entering Decedent's apartment. *Id.* Five minutes

later, at 1:27 a.m., Starks is captured on video removing a television from Decedent's apartment and placing it in her vehicle at 1:28 a.m. *Id.* He then enters the vehicle and drives away. *Id.* at 368. Starks returns approximately fifty minutes later, at 2:12 a.m., and re-enters Decedent's apartment. *Id.*

Thereafter, at 5:13 a.m., Starks is captured exiting Decedent's apartment carrying several bags filled with "unknown items." *Id.* at 370. Starks placed some of the bags in Decedent's vehicle before re-entering Decedent's apartment at 5:15 a.m. *Id.* at 370-71. At 5:16 a.m., Starks is captured leaving Decedent's apartment for the final time, carrying several items, including the bleach bottle later found in Decedent's car. *Id.* at 371. Finally, at 5:21 a.m., Starks departs in Decedent's vehicle and does not return. *Id.* at 372. Between the last time Starks departed and the time Tarsha Eaddy enters on October 25, 2018, no one is ever seen entering or leaving Decedent's apartment. *Id.* at 373.

Starks was charged with criminal homicide and robbery. On November 18, 2019, Starks proceeded to a jury trial before the Honorable Gregory M. Snyder on charges of first-, second-, and third-degree murder.[4] On November 20, 2019, the jury convicted Starks of murder in the first and second degree. On December 31, 2019, Judge Snyder sentenced Starks to two concurrent terms of life imprisonment without the possibility of parole. Starks filed a post-sentence motion, which the trial court denied on May 19, 2020. Starks

_____

[4] The Commonwealth withdrew the robbery charge during trial.

filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b)

concise statement of errors complained of on appeal.   He raises the following

claims for our review:

> 1.   Whether the evidence was insufficient to support [] Starks'
> conviction of murder of the first degree where the Commonwealth
> failed to prove Starks perpetrated the killing and the jury's finding
> of guilt was based on mere conjecture and speculation.
>
> 2.   Whether the evidence was insufficient to sustain [] Starks'
> conviction for murder of the second degree where the
> Commonwealth failed to prove Starks killed the Decedent during
> the perpetration of a robbery.

Brief of Appellant, at 4 (unnecessary capitalization omitted).

Starks' claims both challenge the sufficiency of the evidence

underpinning his convictions.

> Because a determination of evidentiary sufficiency presents a
> question of law, our standard of review is *de novo* and our scope
> of review is plenary.  ***Commonwealth v. Sanchez***, [] 36 A.3d
> 24, 37 ([Pa.] 2011).  In reviewing the sufficiency of the evidence,
> we must determine whether the evidence admitted at trial and all
> reasonable inferences drawn therefrom, viewed in the light most
> favorable to the Commonwealth as verdict winner, were sufficient
> to prove every element of the offense beyond a reasonable doubt.
> ***Commonwealth v. Von Evans***, 163 A.3d 980, 983 (Pa. Super.
> 2017).   "[T]he facts and circumstances established by the
> Commonwealth need not preclude every possibility of innocence."
> ***Commonwealth v. Colon–Plaza***, 136 A.3d 521, 525–[]26 (Pa.
> Super. 2016) (quoting ***Commonwealth v. Robertson–Dewar***,
> 829 A.2d 1207, 1211 (Pa. Super. 2003)).  It is within the province
> of the fact-finder to determine the weight to be accorded to each
> witness's testimony and to believe all, part, or none of the
> evidence.  ***Commonwealth v. Tejada***, 107 A.3d 788, 792–[]93
> (Pa. Super. 2015).  The Commonwealth may sustain its burden of
> proving every element of the crime by means of wholly
> circumstantial evidence.  ***Commonwealth v. Mucci***, 143 A.3d
> 399, 409 (Pa. Super. 2016).  Moreover, as an appellate court, we
> may not re-weigh the evidence and substitute our judgment for

that of the fact-finder. ***Commonwealth v. Rogal***, 120 A.3d 994 (Pa. Super. 2015).

***Commonwealth v. Williams***, 176 A.3d 298, 305–06 (Pa. Super. 2017).

Starks first challenges the sufficiency of the evidence as it relates to his conviction for first-degree murder.

> An individual commits first-degree murder when he intentionally kills another human being; an intentional killing is defined as a "willful, deliberate[,] and premeditated killing." 18 Pa.C.S.[A.] §§ 2501, 2502(a), (d). To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill. ***Sanchez***, 36 A.3d at 37. Moreover, a fact-finder may infer the intent to kill "based on the accused's use of a deadly weapon on a vital part of the victim's body." ***Id.*** The intimacy involved in stabbing one's victim to death clearly indicates malice and specific intent. ***See, e.g.***, ***Commonwealth v. Marrero***, [] 687 A.2d 1102, 1105 ([Pa.] 1996).

***Commonwealth v. Ballard***, 80 A.3d 380, 390 (Pa. 2013).

Starks argues that the verdict in this case was based upon "mere conjecture and speculation," as the Commonwealth presented no murder weapon, scientific evidence, or witness testimony linking him to the crime. Brief of Appellant, at 24. He argues that his mere presence at the scene of the crime, before or during its commission, is insufficient to establish that he was the perpetrator, and that no reliable inference of guilt can be drawn from presence alone. ***Id.*** at 25-26. Starks argues that the video surveillance footage offered by the Commonwealth "did not show all entry points to the apartment[—specifically the window—]and left room for alternative suspects to be missed." ***Id.*** at 28.

- 11 -

Moreover, Starks highlights the fact that the pawn store manager interacted with him while he was wearing the same clothes he would have worn during the murder, but did not mention that he observed any blood or injuries on Starks or that Starks was acting unusually. *Id.* at 29. Similarly, police found no bloody clothing in the Decedent's car and did not note any bruises, cuts, or other marks on Starks' person, all of which is inconsistent with the nature of the killing. *Id.* Starks further points to the dearth of physical evidence—in particular, the failure of the Commonwealth to pursue DNA testing on any evidence recovered from the crime scene. *Id.* at 30. Starks also alleges that the Commonwealth could provide no motive for the killing and did not produce any witnesses to the crime. *Id.* at 31. Finally, Starks places "great importance" on the fact that neither Deputy Coroner Zech nor Dr. Starling-Roney was able to pinpoint a time of death and, as a result, "it was certainly possible that the Decedent was killed sometime after Starks left the apartment at 5:13 a.m. on October 22, 2018[, but before] the body was found" on October 25. *Id.* at 32-33. He is entitled to no relief.

As noted above, the Commonwealth may sustain its burden by means of wholly circumstantial evidence. **Williams**, **supra**. Here, there was ample circumstantial evidence pointing directly to Starks as the only person who could have killed the Decedent. First, Detective Sowers testified that he watched all of the surveillance video obtained from King's Inn Motel and that Starks and the Decedent were the only two people to enter and exit the Decedent's apartment between the last time Decedent was seen alive and the

time her body was discovered. The only other point of ingress to Decedent's apartment was a window that was located more than seven feet from the bedroom floor. That window was found to be locked from the inside, with the curtains drawn. Significantly, although there was dirt on the ground outside the window, there was no evidence of dirt or other material in the apartment that would have indicated someone had entered from the window.

Moreover, within hours of the last time Decedent was observed on camera entering her apartment for the final time, Starks was seen carrying various items, including a television set, from the Decedent's apartment and loading it into the Decedent's vehicle. He also pawned the Decedent's cell phone and was apprehended days later driving her vehicle and in possession of several of her credit cards.

The cases Starks cites in support of his claim are unavailing. Starks refers us to our Supreme Court's decision in *Commonwealth v. Woong Knee New*, 47 A.2d 450 (Pa. 1946), to support his contention that his presence at or around the time of Decedent's murder is insufficient to prove his guilt. In that case, the Court reversed the defendant's conviction for first-degree murder, despite the defendant's admission that he had been with the victim around the time of the murder, as there was no evidence tending to prove that the defendant committed the crime, or casting doubt on the equally likely possibility that an unknown assailant killed the victim after the defendant left his company. *Id.* at 468. In reversing New's conviction, the Pennsylvania Supreme Court noted that:

When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a [fact-finder] must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty.

*Id.*

Starks also cites *In Interest of J.B.*, 189 A.3d 390 (Pa. 2018), in which the Court vacated a juvenile's adjudication of delinquency for murder, finding evidence that he was in the home just prior to the killing and that there were no signs of forced entry did not "yield the sole reasonable inference that J.B. was the murderer." *Id.* at 420. Citing *New*, the Court reiterated that "mere presence at the scene of a murder before, or even during its commission, does not establish sufficient evidence of a defendant's guilt of that offense." *Id.*

These cases are distinguishable from the matter *sub judice*. In fact, the Supreme Court stated in *New* that evidence of a defendant's presence at the scene of the crime *is* sufficient to convict where there is evidence that no one else was with the victim at that time. *Id.* at 456 ("Furthermore, if he was with [the victim] when he was killed, that fact alone is not sufficient to convict him of [the victim's] murder **unless there was evidence that no one else was with [the victim] at that time**.") (emphasis added). Indeed, that is precisely the case here.

The Commonwealth presented ample evidence supporting the "sole reasonable inference" that Starks was the perpetrator. *See J.B.*, *supra*. In particular, video surveillance evidence demonstrated that no one but Starks and the Decedent entered or exited the door of Decedent's apartment from

the time she was last known to be alive until the time her lifeless body was discovered. Starks emphasizes that there was no surveillance video footage of the Decedent's window and, thus, it is possible that someone entered the apartment there. However, multiple witnesses testified that the window was closed and locked from the inside at the time the Decedent's body was discovered, and there was no other evidence that anyone had used the window as a means of ingress. As the Commonwealth aptly points out in its brief, it would have been impossible for anyone to exit through the window and leave it closed and locked behind them, and surveillance video would have captured anyone departing through the apartment's door.

In light of the foregoing, we conclude that the evidence, viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to prove that (1) Decedent was unlawfully killed; (2) Starks was responsible for the killing; and (3) Starks acted with malice and a specific intent to kill.[5] **Ballard**, **supra**. Accordingly, we affirm his conviction for first-degree murder.

Starks next challenges the sufficiency of the evidence supporting his conviction for second-degree murder. Because we have already concluded that the evidence was sufficient to prove that Starks caused Decedent's death,

_____

[5] While Starks does not directly challenge the intent element of his first-degree murder conviction, as we previously stated, "the intimacy involved in stabbing one's victim to death clearly indicates malice and specific intent." **Ballard**, 80 A.3d at 390. Here, the evidence demonstrated that Decedent sustained fourteen stab wounds to her body. This, alone, is sufficient to establish the specific intent to kill.

- 15 -

we will focus our inquiry on Starks' claim that the evidence was insufficient to prove he did so during the perpetration of a robbery.

"A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony."  18 Pa.C.S.A. § 2502(b).  "Perpetration of a felony" is defined, in relevant part, as the act of "engaging in . . . the commission of . . . robbery[.]"  **Id.** at (d).  "The purpose of the felony murder rule is to deter one about to commit a felony in which a reasonable man knows, or should know, that death may result, by making him criminally responsible for any such deaths."  **Commonwealth v. Spallone**, 406 A.2d 1146, 1147-48 (Pa. Super. 1979).

Here, Starks argues that the accused "must form the intent to commit the underlying felony prior to the actual killing for the fact finder to infer the malice element required to sustain a second-degree murder conviction."  Brief of Appellant, at 36.  Starks asserts that, because the exact time of death is unknown, "there was no evidence upon which the jury could reasonably infer Starks killed the Decedent during the perpetration of the robbery" and "any inference the jury made as to when the intent to rob was formed would be mere speculation[.]"  **Id.** at 38.  In support of his claim, Starks relies upon this Court's decision in **Spallone**, **supra**.  In that case, the defendant stabbed and killed the victim after they had quarreled.  The defendant then ran outside for a few seconds, then ran back in, cut the victim's pants pocket with the scissors, and removed his wallet.  The defendant subsequently entered a plea

of guilty to murder, generally, and the trial court found him guilty of second-degree murder because he had killed while perpetrating a robbery, even though the court specifically concluded that he had not formed the intent to rob until after the murder was committed. On appeal, this Court reversed, reasoning:

> Since an accused cannot be perpetrating or attempting to carry out a felony unless, at the time of the prohibited acts, he has formed the intent to commit the felony, a killing cannot be in the course of perpetrating or attempting to perpetrate a felony if the accused, as here found by the court, forms the intent to commit the felony only after the killing.

*Id.* at 1147.

The Commonwealth, in turn, argues that "evidence that the intent to commit the dangerous felony arose before the killing can be established through acts occurring shortly after the killing." Brief of Appellee, at 32. Accordingly, here, the Commonwealth alleges it sustained its burden by presenting evidence that Starks "went to great effort not only to take multiple large items . . . but to pawn them off as immediately as he could[.]" *Id.* at 32-33. The Commonwealth argues that "[t]here was no break in the chain of events that would suggest the intent to perpetrate a felony arose later, unlike cases where the predicate felony occurred well before the homicide, or even at a different location altogether." *Id.* at 33.

We are constrained to conclude that the Commonwealth did not satisfy its burden of proving that Starks committed the killing of Decedent in the course of committing a robbery. The Commonwealth did not establish a time

- 17 -

of death. Video evidence shows Decedent last entering her apartment at 12:11 a.m. on October 22, 2018. He is seen leaving the apartment an hour later and returning at 1:22 a.m. Not until 1:27 a.m. was Starks captured leaving Decedent's apartment with a television set. The Commonwealth presented no evidence as to what occurred in the apartment between 12:11 a.m. and 1:27 a.m. As a result, any inferences the jury may have drawn from the evidence presented could only have been based on pure speculation. Indeed, given the facts possessed by the jury, it would have been equally reasonable to infer that Starks murdered the Decedent and subsequently absconded with her property as an opportunistic afterthought. As the Supreme Court stated in *New*, "[w]hen two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a [fact-finder] must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty." *New*, 47 A.2d at 468.

The Commonwealth argues that evidence of intent to commit a dangerous felony arose prior to the killing may be established through acts occurring shortly after the killing. However, the cases upon which the Commonwealth relies for that proposition are inapposite. In *Commonwealth v. Williams*, 950 A.2d 294 (Pa. 2008), the Supreme Court found sufficient evidence to support a robbery conviction where the appellant convinced the victim to clean out the bed of his semi-trailer, climbed in after him, came up behind him, and shot him dead. *Id.* Appellant immediately closed the rear

door of the trailer and drove off in the victim's rig; he was later found in possession of credit cards and personal property belonging to the victim. *Id.* at 1258. In **Commonwealth v. Robertson**, 463 A.2d 1133 (Pa. Super. 1983), the appellant was convicted of first-degree murder and robbery. Appellant argued that the evidence was insufficient to establish robbery because he only stole from the victim after he was dead, and "one cannot rob a dead man." *Id.* at 1136. The Court rejected this claim, finding that, prior to the victim's killing, the defendant and the victim had been engaged in a dispute over money allegedly owed by the victim to the defendant and that, prior to killing the victim, defendant said to him: "Yeah, well, you ain't going nowhere till I get my money." *Id.* In **Commonwealth v. Legg**, 417 A.2d 1152 (Pa. 1980) (plurality), the appellant and victim engaged in sex and subsequently argued. Appellant stabbed the victim in the back with a knife and then stole her wallet, keys, money, and automobile. The appellant was convicted of second-degree murder and robbery. On appeal, he raised sufficiency claims, as well as a challenge to the trial court's jury charge, wherein the court had instructed the panel that "the intent to commit the felony of robbery may be formed by the actor . . . *either before or after the infliction of the fatal wound*." *Id.* at 1154 (emphasis added). The Court reversed on the basis that the jury instruction was faulty, as it allowed for conviction where the intent to commit robbery was not formed until after the killing. In **Commonwealth v. Ford**, 650 A.3d 433 (Pa. 1994), the Supreme Court upheld convictions of, *inter alia*, first-degree murder and robbery, where

- 19 -

the appellant went into the back room of a store where he worked and stabbed to death the owner and another employee. The drawer of the store's cash register was left open, with coins strewn on the floor, and appellant was later found in possession of a wad of cash that the owner was known to carry in her bra, which was found ripped off her body. Finally, in **Commonwealth v. Giles**, 456 A.2d 1356 (Pa. 1983), the Court affirmed convictions for second-degree murder and robbery. In that case, the victim lived in an apartment above a bar owned by the appellant's family. In accordance with her custom, the victim had gone to the bar to pick up her monthly food stamps and social security check; appellant was present in the bar when the victim did so. Later that same afternoon, the victim was found dead in her apartment. Her bureau drawers were pulled out, their contents on the floor; the decedent's open purse was on the floor, and an envelope in the top drawer of the decedent's bureau was stained with blood.

These cases are all distinguishable from the instant matter. In **Williams**, **Robertson**, **Ford**, and **Giles**, there was record evidence from which a jury could have reasonably inferred that the defendants possessed the intent to commit robbery prior to killing the victims. In **Legg**, although the Court suggested that the evidence was, in fact, sufficient to convict the appellant, this statement was made without analysis and amounted to nothing more than mere *dicta* due to the Court's ultimate disposition based on the jury instruction.

In sum, the Commonwealth here failed to present any evidence that would allow a jury to reasonably infer, without simply guessing, that Starks possessed the intent to rob the Decedent prior to or at the time he killed her. ***New***, ***supra***; ***Spallone***, ***supra***. Accordingly, we are constrained to vacate his conviction for second-degree murder.

Judgment of sentence for first-degree murder affirmed; judgment of sentence for second-degree murder vacated.[6] Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/02/2021

---

[6] Here, Starks was sentenced to concurrent terms of life imprisonment. Because our reversal of his second-degree murder conviction does not upset the trial court's sentencing scheme, we need not remand for resentencing. ***See Commonwealth v. Lomax***, 8 A.3d 1264, 1268 (Pa. Super. 2010) ("Because we can vacate the indecent assault sentence without disturbing the overall sentencing scheme, we need not remand.").